231 P.2d 734

**STATE v. SO.**

No. 7644.

Supreme Court of Idaho.

May 9, 1951.

Robert E. Smylie, Atty. Gen., Blaine F. Evans, William H. Bakes, Assts. Atty. Gen., Henry McQuade, Pros. Atty., Hugh C. Maguire, Pocatello, for respondent.

B. A. McDevitt, Pocatello, for appellant.

KEETON, Justice.

On April 14, 1949, a criminal complaint was filed in a Justice Court of Bannock County, charging Joe Nakamura, alias James Lee (referred to in the transcript of the proceedings as Montana Joe and Joe Montana) ; Tom Wong, alias Edwin T. So, defendant in the trial court, appellant here; John Doe Juan and John Doe Reyes, often referred to in the transcript of the proceedings as the Filipino, with the crime of obtaining money under false pretenses. Sec. 18–3101, I.C. Appellant Mr. So, alias Tom Wong, as far as the transcript shows, is the only one of the three ever apprehended. Mr. So was given a preliminary examination and bound over to the District Court for trial. The complaining witness Paul Okamura claimed in the proceedings taken that he had been victimized by defendant and others, in a con game and separated from the sum of $5000.

Mr. So was tried before a jury and by verdict found guilty. The trial court sentenced him to serve a term of imprisonment in the state penitentiary. From this judgment he appealed.

Appellant assigns thirteen alleged errors, some of which are simply a restatement, in different language, of the propositions contended for in other assignments. Hence, all assignments will not be treated separately, but will be grouped for the purpose of discussion. The answer to one of the questions submitted being, in effect, an answer to some of the other contentions made.

Appellant contends that the amended information filed does not charge a crime and fails to state in ordinary and unambiguous language the essential elements of fraud, and that the representations alleged to have been made (hereinafter set forth) to the complaining witness and victim Okamura, were not of a present or past nature.

The amended information charged that Mr. So, by false and fraudulent pretenses and representations, and with intent to cheat and defraud Mr. Okamura, represented to him (Okamura) that a certain parcel in a cardboard container was of a value in excess of $5000, when in fact, it had a value of less than $5, which Mr. So well knew, and that Okamura being thereby deceived, by false and fraudulent pretenses and representations, was induced to deliver to Mr. So the sum of $5000 (the money was actually delivered to a coconspirator).

To constitute the offense of obtaining money under false pretenses, four essential elements must be charged: there must be an intent to defraud, there must be an actual fraud, false pretenses must be used for the purpose of perpetrating the fraud, and the fraud must be accomplished by means of such false pretenses.

The information contained all essential, necessary averments, and the demurrer to the information was properly overruled. See State v. Stratford, 55 Idaho

65, 37 P.2d 681; State v. Stevens, 48 Idaho 335, 282 P. 93; State v. Whitney, 43 Idaho 745, 254 P. 525.

Appellant contends that a motion to quash the information should have been sustained because of matters which allegedly occurred at the preliminary hearing of appellant. No authority to sustain this contention has been cited.

 The defendant, before the committing magistrate, was charged with others that the crime of obtaining money under false pretenses. He was held to answer to the district court. The proceedings before the committing magistrate and the evidence introduced at that hearing to show a crime had been committed and that there was sufficient cause to believe Mr. So guilty, cannot be attacked in the manner attempted here. Neither can the evidence taken before the committing magistrate be now re-examined to determine whether there was probable cause to hold defendant. State v. Foell, 37 Idaho 722, 217 P. 608; State v. Hunt, 57 Idaho 122, 62 P.2d 1372. The motion to quash was properly denied.

Appellant assigns as error the order in which the proof was submitted and admitted in the proceedings in the district court and contends that it was necessary to establish some joint enterprise, conspiracy or mutual activity of other parties to the crime before conversations and the doing of the others at which he was not present could be admitted in evidence.

The rule covering the situation is stated in 11 Am.Jur. 575, Sec. 42, as follows: "* * * The order of proof is not very material; it is discretionary with the court to admit proof of declarations before proof of conspiracy. The prosecutor may either prove the conspiracy, which renders the acts and declarations of the conspirators admissible in evidence, or he may prove the acts of the different persons and thus prove the conspiracy. However, there must be some tangible, material evidence of the conspiracy or a promise of its production before the court can properly admit evidence of statements made in the absence and without the knowledge of the party against whom they are offered. The evidence need not be direct, positive, and conclusive, but there should be some evidence, and it is for the court, in the first instance, to say whether or not it exists."

 We hold it is discretionary with the trial court to admit proof of declarations and acts of other coconspirators before proof of conspiracy, and that the subsequent connecting of the one on trial with the conspiracy and crime is sufficient. Spies v. People, 10 West.Rep. 701, 122 Ill. 1, 12 N.E. 865, 17 N.E. 898, citing State v. Winner, 17 Kan. 298; 1 Greenl.Ev. Sec. 111; Roscoe, Cr.Ev. 7th ed. p. 415.

 Appellant complains of admission in evidence of State's Exhibit "A" (registration card at the Benson Hotel of defendant and others) because of alleged change, and pencil marks, in the writing on the

card. The exhibit was offered in evidence for the purpose of establishing that the defendant and the alleged coconspirators, Mr. Montana and the Filipino, were staying together at the Benson Hotel. This fact was proved by other testimony, also by admission of the appellant later. Immaterial and irrelevant pencil marks on business records which do not prejudice the rights of the parties are insufficient to bar the exhibit from admission in evidence. There was no prejudice.

■ Appellant contends that State's Exhibit "D", a package represented by defendant So's coconspirators to contain articles valued in excess of $5000, was erroneously admitted in evidence. The package in question contained some candy bars and was represented to the complaining witness Mr. Okamura, by others connected with the crime, and acting in conjunction with Mr. So, as containing valuable articles. Further, the package was exhibited to Mr. Okamura and representations made of its value by other persons concerned in the commission of the crime as hereinafter shown, who were in cahoots with the appellant. The package was properly admitted in evidence.

Appellant contends that the acts, statements and conduct of Mr. Montana, one of the principals in the alleged crime, but not on trial, not occurring in his (So's) presence should not have been admitted in evidence.

■ Where two or more parties are concerned in the commission of a crime, or are working with a common purpose, each is liable for the acts and representations of his associates or participants in the crime, and where two or more persons so associated conspire to obtain the money of another by false pretenses, both are criminally liable, and the act of one is the act of both. Commonwealth v. Mycock, 315 Mass. 262, 52 N.E.2d 377; People v. Harrington, 310 Ill. 613, 142 N.E. 246; Card v. State, 109 Ind. 415, 9 N.E. 591; People v. Rogers, 375 Ill. 54, 30 N.E.2d 77.

■ Where a conspiracy has been established to commit a crime, each declaration or act of any of the conspirators, during the pendency of the criminal enterprise, in pursuance of the original plan and with reference to the common object, is competent evidence against each of them. Card v. State, supra.

■ It is unnecessary that the false pretenses or representations, if communicated, be made by the defendant in person. It is sufficient if it is done by someone acting with him or instigated by him so to do. Commonwealth v. Harper, 195 Ky. 843, 243 S.W. 1053.

Complaint is made that the court should have advised the jury to acquit the defendant. There is no merit to this contention, and it will not be discussed.

■ Appellant complains and assigns as error that other alleged participants in

the victimization of the complaining witness were not named in the information or charged with the commission of the alleged crime, and no conspiracy was charged. The answer to this contention is that neither Mr. Montana, nor Reyes, the Filipino, were, as far as the transcript shows, ever apprehended, or given a preliminary examination. Without such preliminary examination, or waiver thereof, they could not be charged with a felony in the district court. Sec. 19-1308, I.C.

Further, Sec. 19-1430, I.C. provides: "* * *. and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall hereafter be prosecuted, tried, and punished as principals, and no other facts need be alleged in any indictment against such an accessory than are required in an indictment against his principal."

Section 19-1431, I.C. provides: "An accessory to the commission of a felony may be indicted, tried, and punished, though the principal may be neither indicted nor tried."

■ The common law distinction between classes of parties to criminal offenses is abolished. All persons concerned in the commission of a crime are principals, and one who aids and abets another in the commission of a crime is a principal. 22 C.J.S., Criminal Law, § 27, page 82.

■ No reference to accused as an accessory is necessary. 42 C.J.S., Indict-ments and Informations, § 148, page 1078; State v. Bachelor, 67 S.D. 259, 291 N.W. 738.

Nor is it necessary that facts be set out showing whether the accused was an accessory or a principal, 42 C.J.S., Indictments and Informations, § 148, page 1078; Browning v. State, 53 Ariz. 174, 87 P.2d 112; Nowabbi v. State, 31 Okl.Cr. 158, 237 P. 868; Trimble v. Territory, 8 Ariz. 281, 71 P. 934; State v. Ayres, 70 Idaho 18, 211 P.2d 142.

■ An accessory to a crime, or a participant therein may be charged as a principal, and the information need not allege facts different from those required to be alleged against the principal. 42 C.J.S., Indictments and Informations, § 148, page 1077.

■ A detailed review of all the evidence introduced would serve no useful purpose.

Briefly summarized, the testimony established the following facts, among others:

Mr. So, a cook by occupation (so he claimed), left Denver, together with Mr. Montana and the Filipino, enroute to Pocatello. Mr. So testified that he was employed by Mr. Montana to make the trip. Leaving Denver on April 3, 1949, they drove directly to Pocatello, and registered at the Benson Hotel on the evening of April 4, 1949, and were assigned to a room together. They checked out of the hotel on the morning of April 12th, all three of .

them being present, and one of the parties paid for the room with a one hundred dollar bill. Mr. So had previously registered at another hotel on April 10th, under the name of Tom Wong, giving his address as 221 Stockton Street, San Francisco, California. He checked out of this hotel on the morning of April 12th.

Mr. Montana and Mr. So, immediately following the victimization of Mr. Okamura, as hereinafter shown, left Pocatello together in Mr. So's car in the early afternoon of April 12th.

On April 3, after registering at the Benson Hotel with Mr. So and the Filipino, Mr. Montana, who had a slight acquaintance with the complaining witness, Mr. Okamura, contacted him by telephone and renewed the acquaintance; and thereafter arranged several meetings with him and advanced the build-up and come-along for what happened thereafter. Eventually Mr. Montana asked Mr. Okamura if he would claim ownership of, and deliver a package to be brought in by a sea captain, or his emissary from Europe, represented to contain valuable articles, supposedly jewelry. These articles were to be delivered and sold by Mr. Okamura to a money baron from San Francisco. Following numerous talks Mr. Okamura consented. Mr. Montana thereafter advised Mr. Okamura in substance that the would-be purchaser of the articles had arrived, and was staying at the Bannock Hotel, and arranged a meeting between Mr. Okamura and the said person. On April 11th, following some mystifying capers unnecessary to relate, Mr. Montana and Mr. Okamura, in Okamura's car, parked across the street from the Bannock Hotel, and a guest of the hotel came out and got in the car, being none other than Mr. So, the alleged money baron. He was introduced by Mr. Montana, to Okamura as Tom Wong. The three parties then drove down the street, parked the car, and Mr. So, alias Tom Wong, inquired about the stuff, and said "Did you get your stuff,—did you get your business done with?" Mr. Montana said he did not have the stuff, but could get it in a short while, and Mr. So said "Hurry and get it, as I am anxious to leave town. I want to get out." Mr. Montana exhibited a small package, advising Mr. So, alias Tom Wong, that he had fifty more just like it, to which Mr. So, after examining, or pretending to examine, the package replied "That is fine stuff" and further said "I am anxious to leave town. I want to get out. * * * I brought plenty of money along with me to make the deal, and I want to get it over with quick." Mr. So then took an envelope from his pocket, showed some money and said "I have fifty thousand dollars here. * * * Take me back to the Bannock Hotel then until you get the stuff, then come back and pick me up." Mr. So was driven back to the hotel and Okamura and Mr. Montana drove to the depot, and Mr. Montana there introduced Mr. Okamura to the Filipino, who had suddenly appeared, as Johnny. Wheth-

er Johnny was the emissary of the mysterious sea captain, we are unable to determine. At any rate, he acted as the contact man. The Filipino and Mr. Montana then talked together.

The hour of decision had arrived. It was now imperative, if Mr. So and Co.'s undertaking were to be successful, to immediately get down to business and lower the boom. Thereupon, Mr. Montana advised Mr. Okamura he did not think he could make the deal, i. e. the purchase, as he did not have enough money; that he needed $15,000 and only had $9000. The Filipino, being advised by Mr. Montana of the situation, left to interview the mysterious captain, or his emissary, as to the terms of the transaction, and the Filipino later returned and advised Mr. Montana that the captain wanted to get to Seattle to dispose of the package, and any deal made would have to be done quickly. Mr. Montana then requested Mr. Okamura to advance him $6000 to make the deal, i. e., purchase the supposed jewelry, and that when the money was available, and the contraband purchased, the transaction (sale of articles to Mr. So) would take only about an hour, and on completing the deal with the captain, the contraband, or whatever it was, would be sold to Mr. So, and Mr. Okamura would get his money back. Mr. Montana advised Mr. Okamura he would make it right with him. Mr. Okamura then raised $5000 to help make the purchase from the mythical sea captain.

The next morning, April 12th, Mr. Okamura and Mr. Montana went again to the depot, and the same parties were present at the meeting as the day before.

The Filipino then had, or pretended to have, another alleged talk with the never seen, mysterious captain, or his emissary, and advised Mr. Okamura and Mr. Montana that the deal could be closed for $14,000, the balance of $1000 to be paid later. A package was then mysteriously produced, State's Exhibit "D", by the Filipino, and he and Mr. Montana put the same in one of the depot lockers, and Mr. Montana then paid, or pretended to pay the Filipino $9000, as a representative of the said sea captain, and Mr. Okamura advanced $5000 to the Filipino for the same purpose.

At this point, the Filipino, after receiving Mr. Okamura's money, disappeared with the speed of a flying saucer, as mysteriously as he had originally appeared, and as far as the transcript shows, departed for parts unknown, leaving no forwarding address, and has not been seen or heard from since.

Mr. Montana and Mr. Okamura then went to the Bannock Hotel, about noon April 12th, to sell the package to the money baron, Mr. So. No definite price was ever fixed. Mr. So, however, had checked out (April 12, 1949) leaving a note that he had gone to Salt Lake City and would be back that night. Hence he could not be located at that time. Mr. Montana then gave Mr.

Okamura the key to the locker in the depot in which the package of supposed valuables had been deposited, for the purpose of allaying his misgivings and satisfying him that he was fully protected. Together they then went to a place in Pocatello to play pool. During a temporary absence of Mr. Okamura, Mr. Montana, like the seldom seen Filipino, disappeared as quickly as Mr. Okamura's money, leaving no forwarding address.

Mr. So and Mr. Montana had made prior arrangements to meet at a predetermined place in Pocatello for the return trip to Denver—in other words, the get-away—and left immediately. Mr. So testified in substance that Mr. Montana thereafter took a vanishing powder at Green River, Wyoming, and as far as the transcript discloses, has not been heard from since.

Interpolating at this point, Mr. Montana must have been of an ungrateful, thankless nature, for Mr. So informs us that Mr. Montana never paid him for the trip to Pocatello, and not only that, he departed with all Mr. So's personal belongings, including his luggage. Such conduct and breach of ethics among friends, cannot be condoned and should be frowned down.

Mr. So was later arrested in Denver and returned to Idaho.

In the conspiracy and drama depicted, Mr. Montana posed and represented himself as the alleged purchaser or would-be purchaser of contrabands, or other valuable articles, brought in, or to be brought in, from Europe, by the mythical sea captain, or his emissary; the Filipino posed as a representative or emissary of said sea captain; Mr. So as the tycoon and big money man from San Francisco, and as the intended purchaser from Mr. Montana and Mr. Okamura, of the contraband articles. The transaction having been completed and the money secured, Mr. Okamura was left holding the bag—in this case the box—which was represented to contain jewelry or other valuables.

When the package left at the depot by Mr. Montana and the Filipino was later examined, it was found to contain two packages of O'Henry candy bars. There was testimony that Mr. So had purchased two boxes of candy bars in a drug store in Pocatello shortly before the victimization. Mr. Okamura doesn't like candy bars.

That the appellant, Montana and the Filipino acted in concert and that there was a preconceived plan or design, was fully established.

Mr. So complained in his brief on appeal that his testimony contradicts some of the evidence from which the above summary of facts is taken. The answer to this contention is that the jury, not being credulous and gullible, evidently did not believe him.

Other contentions regarding contradictions in the testimony of the State's witnesses, the impeachment of some of the State's witnesses, conflicts, if any, between

the evidence given at the preliminary examination and that given at the trial, and the testimony given by Mr. So, were all questions to be evaluated by the jury.

 Error has been assigned in the admission of testimony of Clyde Raidy as not tending to involve the defendant in any of the acts complained of. The testimony of Mr. Raidy covered some of the activities of Mr. Montana and was properly admitted.

 Appellant assigns as error the admission of the testimony of witnesses Ogata and Balleza. Ogata's testimony in rebuttal contradicted a statement of Mr. So relative to his being, or not being, in Salt Lake City. The testimony of Balleza complained of was stricken by the court, and the jury instructed to disregard it.

Other errors assigned have been disposed of by what has already been said.

Thus the story of the sea captain and the candy bars comes to an end. The judgment appealed from is affirmed.

GIVENS, C. J., and PORTER, TAYLOR and THOMAS, JJ., concur.