655 P.2d 99

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Rory BROOKS, Defendant-Appellant.**

No. 13297.

Court of Appeals of Idaho.

Dec. 7, 1982.

Petition for Review Denied
Jan. 27, 1983.

John C. Lynn, of Lynn, Scott & Hackney, Boise, for appellant.

David H. Leroy, Atty. Gen. by Lynn E. Thomas, Sol. Gen., Boise, for respondent.

WALTERS, Chief Judge.

Rory Brooks appeals the conviction and his sentence to an indeterminate twenty-year term for murder in the second degree of Enrico Flory. He raises six issues. (1) He contends that venue of his trial should have been changed because of extensive pre-trial publicity. (2) He claims error in the admission of testimony concerning conspiracy to commit the murder. (3) He argues that the trial court erred in denying his motion for acquittal for failure of the state to prove corroboration of the testimony of an accomplice. (4) He cites error to the failure of the court to instruct the jury, as a matter of law, concerning the status of one of the witnesses as an accomplice. (5) He contends that prejudicial and misleading remarks were made by the prosecuting attorney in the opening statement to the jury, regarding the testimony expected to be given (but later recanted) by one of the state's witnesses. (6) He asserts that the trial court abused its discretion by imposing an indeterminate sentence of twenty years. We affirm the conviction and sentence.

Enrico Flory, seventy-six years old, lived alone in a small, one-bedroom house on Bel-la Street in Boise's North End. He depended on his monthly Social Security check to meet his living expenses. Flory was well-known and well-liked, paying his monthly bills routinely, entertaining the neighborhood youth with his story telling, and caring for homeless cats. This latter practice earned him his nickname, "Cat Man of Bella Street." On June 4, 1976, one of the neighborhood boys found him lying peacefully on the bed in his small house, dead of apparently natural causes. At least that was the county coroner's initial determination, because the body appeared to be resting in a natural state with no signs of foul play indicated.

Two months later, teenager Darren McLenna confessed to Boise police that he and three other teenage boys had visited Flory on June 3, had smothered the old man to death, and had stolen his Social Security money, which amounted to approximately $50.00. McLenna and Demetrio (Mitch) Esquivel were both committed in juvenile court to the custody of the Idaho Health and Welfare Department, under the Youth Rehabilitation Act. Petitions under the Act were also filed against Steven Wolf, age fifteen, and Rory Brooks, age seventeen, alleging their involvement in the death of Flory. A magistrate judge subsequently ruled that Wolf and Brooks were suitable for trial as adults and waived jurisdiction under the Act. An appeal of this ruling delayed trial for nearly two years. The Idaho Supreme Court eventually affirmed the ruling. *See Wolf v. State,* 99 Idaho 476, 583 P.2d 1011 (1978). After that appeal, Steven Wolf pled guilty to second degree murder and was sentenced to an indeterminate term not to exceed thirty years.

In February, 1979, a jury found Rory Brooks guilty of murder in the second degree for the killing of Enrico Flory. The trial court entered a judgment of conviction and sentenced Brooks to an indeterminate term not to exceed twenty years.

## I. CHANGE OF VENUE

The first issue we address is whether the trial court erred in denying Brooks's motion

for change of venue based on the pre-trial publicity. The case was extensively publicized in a newspaper—the Idaho Statesman—and by news reports on various television and radio networks in Ada County. Brooks relies on photocopies of numerous articles from the Idaho Statesman published from May, 1977, to December, 1978, on copies of news script read over local television stations, and on the testimony of Howard Schragg, a communications expert, to support his position that the local publicity effectively denied him a fair trial.

■ The right to a trial by an "impartial jury," guaranteed by the Sixth Amendment of the United States Constitution, is made applicable to the individual states through the Fourteenth Amendment. *Parker v. Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973). In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). In Idaho, when one who is criminally accused believes a fair and impartial trial cannot be had in the county with venue, he may, by statute and by rule of criminal procedure, seek a change of venue. I.C. § 19–1801; I.C.R. 21. Upon motion, if the court is satisfied that a fair and impartial trial cannot be had in the county where the case is pending, the proceeding shall be transferred to another county. *Id.*

In *State v. Needs,* 99 Idaho 883, 890, 591 P.2d 130, 137 (1979), our Supreme Court set forth guidelines for determining change-of-venue issues on appeal. The Court said:

[t]his Court has held on many occasions that the decision to grant or deny a change of venue rests within the sound discretion of the trial court. [Citations omitted.] Further, where it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, the trial judge's refusal to grant a change of venue is not a ground for reversal. Among the factors which this Court will consider in determining whether a criminal defendant actually received a fair trial are affidavits indicating prejudice or an absence of prejudice in the community where the defendant was tried, testimony of the jurors at voir dire as to whether they had formed an opinion of the defendant's guilt or innocence based upon adverse pretrial publicity, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of the pretrial publicity, and the amount of time elapsed from the time of the pretrial publicity to the trial itself. [Citation omitted.] Publicity by itself does not require a change of venue.

We will proceed to analyze Brooks's venue issue in light of the above criteria. We note that the record indicates that radio and television broadcasts resembled the newspaper articles in content and frequency; for the purpose of this analysis, therefore, we discuss only the nature of the newspaper articles.

The murder of the Cat Man attracted great public interest and the local news media gave the story extensive coverage, heaviest in May, June, and July of 1977. In May, a front page headline in the Idaho Statesman discussed the facts of the case, the juvenile records of Brooks and co-defendant Steven Wolf, and the waiver of juvenile status. The article stated the boys' juvenile records included kidnapping, rape, and robbery, including a conviction for a rape-kidnapping during the interim period between Flory's death and the filing of murder charges against Brooks and Wolf. The article then discussed the magistrate order that waived the juvenile status based on the juvenile records and on psychological evaluations indicating the two boys were not suitable for rehabilitation within the juvenile system.

In June, a flurry of articles appeared in the Statesman, mostly due to Wolf's escape from the Ada County Jail. For the five days Wolf was free, the news media focused on the escape, rumors of Wolf sightings, the manhunt, and his eventual capture. Wolf's picture was often published and his name

was captioned in the headlines many times. The articles submitted with the record on appeal were not of a sensational tone, nor were there any editorial opinions aimed at impassioning the public against Brooks. However, the details of the murder were related many times within the news stories, Brooks's name appearing as one of the accused.

From July, 1977, through September, 1978, newspaper articles on the case were sporadic. There appears to have been no sensationalism or overplay. In September, Brooks requested a change of venue. He argued that, due to pervasive publicity of the case, it was impossible for him to receive a fair and impartial trial in Ada County. The motion was denied.

In November, 1978, three months before Brooks was to go to trial, co-defendant Wolf pled guilty to second degree murder of Enrico Flory. The plea made the Statesman's front page. The article outlined the entire course of events as narrated by Wolf from the witness stand when he entered his guilty plea. Wolf admitted that he and three others were involved. The article then went on to say that two youths, McLenna and Esquivel, had been previously "convicted" of the murder in juvenile court and that Rory Brooks awaited trial for murder as an adult in district court. These matters were reiterated in an article appearing on December 30, after Wolf was sentenced. Brooks was again implicated by the article as one of the four boys involved, and it was again stated that he awaited trial.

In February, 1979, a few days before his trial, Brooks renewed his motion for change of venue based on the publicity surrounding the case in Ada County. A hearing on the motion was held. The trial court heard oral testimony from editors and directors of the local news media regarding the content and extent of their publications on the murder case. Exhibits of newspaper articles and scripts for radio and television news broadcasts were admitted as evidence.

Howard Schragg, a psychologist specializing in learning and motivation, also testified. He reviewed the contents of the news coverage and characterized it as objective and factually based, with no sensationalism evident. However, he also expressed his expert opinion that people hearing the news broadcasts and reading the news articles would likely form an opinion that Brooks was guilty. Further, Schragg testified there existed no assurance that jurors of average intelligence could safeguard against the later surfacing of this opinion from their subconscious, even though they professed an ability to judge the case solely on the evidence submitted at trial, unimpaired by any prior knowledge.

The trial court denied the motion for change of venue, without prejudice, finding that the bulk of the publicity occurred over a period well-removed from the present trial proceedings, that the coverage consisted of factual accounts and not of editorials aimed at impassioning the public against Brooks, and that there existed no pervasive evidence of subconscious prejudices. The court allowed the motion to be subject to renewal in the course of jury selection, should the initial findings appear incorrect.

On February 12, Brooks's trial began with the *voir dire* process of selecting twelve jurors and two alternates. Each prospective juror was individually questioned, all other members of the jury panel having been removed from the courtroom. Thirty-three prospects were questioned before the jury selection was complete. Nine prospects were dismissed for cause by the trial court. See I.C. §§ 19–2017—19–2029; I.C.R. 24(a). Of these nine, seven were dismissed because media coverage of the Cat Man murder had convinced them Brooks was one of the four teenage boys responsible. Each prospect felt Brooks had to prove his innocence to them; or they felt they could not put aside their belief in his guilt in order to decide the issue solely on the evidence introduced at trial. Ten potential jurors were dismissed by peremptory challenges. The record does not disclose whether the prosecution or the defense exercised a peremptory challenge when a potential juror was so dismissed; the record

does show that only six full rounds, of the possible ten rounds, of challenges available to each side were exercised. *See* I.C. §§ 19–2015, 19–2016; I.C.R. 24(b).

One of the twelve jurors selected testified in *voir dire* that she believed Brooks was guilty based on what she had read and heard about the case in the media. She was neither challenged for cause nor dismissed by a peremptory challenge. Another of the twelve jurors selected was of the opinion that Flory had been murdered, though he stated he had never heard of Brooks. He was challenged for cause, but the trial court denied that challenge. Both of those jurors stated they could judge the case solely on the evidence admitted at trial, unimpaired by their prior opinions.

Only two of the twelve jurors selected, and the two alternates, knew nothing about the murder. Of those with knowledge of the case, all remembered the Cat Man had been murdered, and most associated Steve Wolf with the crime. Brooks's name was only recognized by the one woman mentioned above, though six other jurors associated "juveniles" with the murder.

The jury *voir dire* lasted for three days. On the morning of the last day of the jury selection, the Idaho Statesman carried a front page article about the Brooks trial. When the court opened, the trial judge questioned the jurors as to whether they had read the morning paper or heard any news about the case. Three of the twelve jurors acknowledged seeing the article in the Statesman. The jury was removed from the courtroom while these three were individually questioned about the extent of the article each had read.

All three of these jurors had read the headlines. Beyond the headlines, one had read only the first few sentences of the article, and the other two professed reading only the beginning of the article, which reported the jury selection. None of the three testified to reading beyond the discussion of the jury selection, once they recognized what the article was about. All three denied reading any of the article dealing with the facts of the case.

After the trial court questioned the jurors and gave counsel also a chance to examine the jurors, the case was allowed to proceed. The motion for change of venue was not renewed during or after completion of the *voir dire* process.

■ In regard to whether the record shows Brooks did not have a fair and impartial trial, we note that although one juror expressed an opinion of Brooks's guilt, she testified to an ability to objectively make her final decision solely upon the evidence admitted in court. Her selection as a juror went unchallenged. Howard Schragg's testimony concerning the possible prejudicial effect of latent opinions of guilt could have been used as a basis for granting the motion for change of venue, in light of the publicity and the recognition of the Cat Man murder incident by most of the jurors. However, in support of the trial court's determination of the motion, was the statement of each juror assuring their ability to objectively determine the issue of guilt or innocence on the facts presented in the trial. A judge must be able to rely on such assurances in light of the pervasive influence of the free press on our daily lives. Words of the Idaho Supreme Court from long ago persuasively justify this conclusion even today.

If the rule were otherwise jurors would have to be selected from a class who do not read or are so little informed about current events transpiring in their community that they know nothing of its affairs. This would result in juries being made up of a class of persons below average in intelligence, which the law does not require.

*State v. McLennan,* 40 Idaho 286, 294–295, 231 P. 718, 720 (1925).

■ The evidence of pre-trial publicity submitted on this appeal shows numerous times over the two year period—right up to the day of trial—where Brooks was implicated in the murder. The reports contain only dispassionate and objective factual accounts of events then occurring. They contain no editorial comments or other

opinions which would give rise to feelings of passion or outrage against Brooks, thus compromising his right to a fair trial. *See State v. Powers,* 96 Idaho 833, 837, 537 P.2d 1369, 1373 (1975). *See also State v. Needs,* 99 Idaho 883, 891, 591 P.2d 130, 138 (1979); *State v. Bitz,* 93 Idaho 239, 243, 460 P.2d 374, 378 (1969). Neither the state nor Brooks exercised all of the allotted peremptory challenges. It was necessary to question only thirty-three potential jurors before the twelve jurors and two alternates were selected. It does not appear from the record that unusual difficulty was experienced in selecting the jury. Applying the criteria set forth in *Needs, supra,* we hold that Brooks was not denied a fair and impartial trial and that the trial court did not abuse its discretion in denying Brooks's motion.

## II. HEARSAY EVIDENCE

Brooks next contends the trial court erred by allowing two witnesses for the state to testify to out-of-court statements made in Brooks's presence by alleged co-conspirators. Over Brooks's objection, Michael Wolf, a younger brother of the co-defendant who had pled guilty, and Darren McLenna each testified that Brooks was present during conversations regarding the plan to steal Flory's money. Brooks asserts that the testimony concerning these conversations was inadmissible hearsay evidence.

### A. Testimony of Michael Wolf.

We will discuss first the testimony of Michael Wolf. He testified that he was present when plans to take Flory's Social Security money were discussed among Brooks, McLenna, Steve Wolf, and Esquivel, about a week before the murder. Michael Wolf was unable to recall what was specifically said by any particular member of the group. He was able to testify only that "they were planning on taking the money, the Social Security checks." He identified "they" as McLenna, Brooks, Steve Wolf and Esquivel. Brooks claims this disclosed "conversation" was hearsay and should have been excluded by the trial court.

Hearsay evidence has been defined by the Idaho Supreme Court as follows:

> [h]earsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion of the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.

*Isaacson v. Obendorf,* 99 Idaho 304, 309, 581 P.2d 350, 355 (1978). *See also Frank v. City of Caldwell,* 99 Idaho 498, 499, 584 P.2d 643, 644 (1978) *and State v. Ortega,* 95 Idaho 239, 241, 506 P.2d 466, 468 (1973).

Under the foregoing definition, the testimony by Michael Wolf of the "conversation" was admissible. The definition requires that the proffered evidence depend—for its probative value—upon the credibility of the out-of-court asserter before it qualifies as hearsay. Here the testimony concerned the simple fact that certain subjects were discussed by the boys. The testimony did not depend, for its probative value, upon the credibility of the boys—the out-of-court asserters. The testimony was admissible to show simply that Brooks was present when the subject of robbing Flory was discussed.

When a statement is not being offered as proof of the facts contained in the statement but merely as proof that the statement was made, i.e., that certain words were spoken, the hearsay rule has no application. *State v. Ortega,* 95 Idaho 239, 241, 506 P.2d 466, 468 (1973); *see also Quayle v. Mackert,* 92 Idaho 563, 447 P.2d 679 (1968). Statements inadmissible to prove the truth of what they assert may be admitted in evidence, if the fact of the assertion is in itself relevant, irrespective of its truth. *State v. Ortega, supra,* 95 Idaho at 241, 506 P.2d at 468. Here, the fact that the discussion had taken place was relevant, circumstantially, to show that Brooks, McLenna, Steve Wolf, and Esquivel associated together, and undertook plans which would take them to the scene of the murder. We hold that there was no error in the admission of the testimony of Michael Wolf concerning

the plans discussed among the persons ultimately charged with the murder.

### B. Testimony of Darren McLenna.

We turn next to the testimony of Darren McLenna. He was allowed to testify as to discussions among him, Rory Brooks, Steven Wolf, and Mitch Esquivel to "get" Flory's money. He stated that Wolf and Brooks approached him three days before Flory was murdered. He testified:

> ... they, Steve and Rory came up to me and said they had a plan to get some money... They wanted to go into his house and hit him over the head with a big object and take his money because he knew he could—knew us if we didn't.

Q. When you say "he", you mean Henry Flory?

A. Henry would—he knew us, so he would be able to take us to court if they didn't kill him.

The next day, McLenna, Wolf, Esquivel, and Brooks met again and discussed ways to accomplish their plan.

Q. What were some of the ways that were suggested by whom, if you recall?

A. Um, Well, I can't recall who, but someone said a big—big stick to hit him over the head or get him while he's laying down and throw a rock on him. Um, or smother him.

Q. Who suggested smothering?

A. Myself.

Q. What was the rest of the discussion about the money, for instance?

A. Um, well, I was told there there was a hundred seventy dollars and that—

Q. Do you remember who mentioned that first?

A. It was Steve [Wolf].

Q. Where was that money to come from?

A. His Social Security money.

Q. Was there any discussion when his check arrived?

A. Um, it was around the first of the month.

Q. Okay. What was the rest of the conversation about committing the crime at that time?

A. Well, we decided to go over there and see if he had gotten his check yet.

Q. And what day are we talking about now, Darren?

A. Um, it was the first—of June, and we went over to his house and beat around the bushes; and Steve asked him numerous questions about his money and his checks and he—we found out that he hadn't gotten it yet, so we left.

Q. Who's "we"?

A. All four of us.

Q. Would you name the names again?

A. Rory, Steve, Mitch [Esquivel] and myself.

Q. Meaning Rory Brooks, the defendant?

A. Yes.

McLenna then testified that on the third day of June, the same four boys went to Flory's house, smothered Flory and took his money.

Brooks argues (1) that because the conversations related by McLenna occurred out-of-court, they were inadmissible hearsay. He further asserts that the co-conspirator exception to the hearsay exclusionary rule was inapplicable because (2) there was a failure by the state to show that there was any conspiracy in fact at the time the statements were made; and (3) if there was a conspiracy, there was an insufficient showing of reliability of McLenna's testimony as a condition to the admission of the evidence.

### 1. The Hearsay Question.

■ For the same reasons we explained in addressing the testimony of Michael Wolf, the testimony of Darren McLenna was admissible. It showed that "conversations" had taken place and disclosed who was present during those conversations. It did not depend, for its probative value, upon the credibility of the parties to the conversation. In so far as it was not offered for the truth of the content of the conversation, it was not hearsay.

However, McLenna's testimony concerning the discussion of a "plan" to rob and murder Flory must have been relevant for the truth of the assertions because the state implicitly alleged that such a plan existed, when it charged Brooks with first degree murder. Consequently, this testimony, if none other, is hearsay. We are therefore required to examine the co-conspirator exception to the hearsay rule, to determine whether the testimony in that respect was admissible.

Idaho has adopted the co-conspirator exception. *See* G. Bell, Handbook of Evidence for the Idaho Lawyer, 172–173 (2d ed. 1972). In *State v. So,* 71 Idaho 324, 330, 231 P.2d 734, 737 (1951), it was held:

> [w]here a conspiracy has been established to commit a crime, each declaration of any of the conspirators, during the pendency of the criminal enterprise, in pursuance of the original plan and with reference to the common object, is competent evidence against each of them.

*See also State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971).

### 2. Existence of Conspiracy.

It is not necessary that a formal charge of conspiracy be made against the co-conspirators, before the conspirator exception to the admission of hearsay evidence applies. *United States v. Lyles,* 593 F.2d 182 (2d Cir.1979), *cert. den.,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Zamarripa,* 544 F.2d 978, (8th Cir.1976), *cert. den.,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977); *United States v. Richardson,* 477 F.2d 1280 (8th Cir.1973), *cert. den.,* 414 U.S. 843, 94 S.Ct. 104, 38 L.Ed.2d 82 (1973); *United States v. Williams,* 435 F.2d 642 (9th Cir.1970), *cert. den.,* 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971). It is necessary, however, that there must be some evidence of the conspiracy, or a promise of its production, before the court can properly admit evidence of statements made in pursuance of the conspiracy.

> [I]t is discretionary with the trial court to admit proof of declarations and acts of other co-conspirators before proof of conspiracy, and that the subsequent connecting of the one on trial with the conspiracy and crime is sufficient.

*State v. So,* 71 Idaho at 329, 231 P.2d at 737.

The court in *So* did not address the *quantum* of proof, sufficient to establish a conspiracy in order to admit proof of declarations and acts of the co-conspirators, beyond the observation that "some" evidence should be presented. *Id.* An earlier Idaho civil case, however, held that where several defendants were charged with conspiracy to defraud the plaintiffs, the plaintiffs were "entitled to prove the several or individual acts or statements of any one of the conspirators made or done in furtherance of the object of this conspiracy" when evidence sufficient to make a prima facie case had been introduced. *Shields v. Ruddy,* 3 Idaho 148, 155, 28 P. 405, 407 (1891).

We perceive no reason why the "prima facie case" rule, adopted in *Shields* for a civil case, should not apply to a criminal case. With little exception, the courts of other jurisdictions which have considered the question of the *quantum* of proof necessary to be established by independent evidence, to render admissible the extrajudicial statements of an alleged co-conspirator in a criminal case, have held or recognized that the independent evidence must establish a prima facie case of conspiracy. *See* Annot., 46 A.L.R.3d 1148, 1161–1167 (1972).

Because "prima facie" is a nebulous term, defying exact definition, it can be defined only in terms of "sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy." *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, 503 (1966), *cert. den.,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). *See also State v. Speerschneider,* 25 Ariz.App. 340, 543 P.2d 461 (1975); *State v. McGonigle,* 144 Wash. 252, 258 P. 16 (1927); *Jasch v. State,* 563 P.2d 1327 (Wyo.1977). The distinction must be kept in mind between proving a conspiracy as a crime, where proof beyond a reasonable doubt would be required, and establishing a conspiracy as a pre-requisite to the admission of statements of alleged co-con-

spirators, where a prima facie showing is sufficient. *Thompson,* 139 N.W.2d at 502.

 Looking at the record before us as a whole, independent of the testimony of McLenna, to determine whether there was sufficient evidence from which the trial court reasonably could infer the existence of a conspiracy, we see the following evidence. Michael Wolf, brother of co-defendant Steve Wolf, testified that he was present and overheard Brooks, McLenna, Steve Wolf and Mitch Esquivel planning to go to Flory's house and take the Social Security money, about a week before the incident. The owner of a neighborhood store testified that Flory had cashed his Social Security check in the store just prior to his death. On June 4, the day after Flory's death and the same day that Flory's money was divided among the boys (according to the testimony of McLenna), Brooks and Wolf were at a local hamburger stand. In response to direct examination by the prosecuting attorney, the owner of the stand testified:

Q. Anything unusual about their behavior that you recall?

A. Well, not only that they did an awful lot of buying; that was all, just bought all day long.

Q. Who was that you're referring to "they"?

A. Rory and Steve.

 \* \* \* \* \* \*

Q. And what did they purchase, if you recall?

A. I don't recall what it was. Possibly coke or—.

Q. How many times that day were they in?

A. Well, I couldn't say how many times; because they were there over and over and over just all day long.

Q. Do you recall approximately how many things you sold them?

A. Well, it was a variety of things. I know I made the remark to the girls that I wondered if we was ever going to get those boys filled up, because they bought hot dogs, hamburgers, milk shakes, ice cream, cokes.

Q. Is that more than they usually purchase?

A. Yes, quite a bit more.

Finally, we have the testimony of Mitch Esquivel, called as a witness by Brooks. Esquivel denied that he entered Flory's house and participated in the murder. However, he testified that he was present when the robbery and murder of Flory was planned; that he followed the other boys to Flory's house; that he observed them enter and later exit the house; and that he received a "share" of the money.

 We are compelled to consider Esquivel's testimony in determining whether a prima facie case of conspiracy existed as a condition to the admission of McLenna's statements, for the following reasons. First, McLenna's testimony was offered before proof of the conspiracy, thus requiring us to view the whole record.

> Where an examination of the record as a whole shows facts from which the trial court could reasonably infer the existence of a conspiracy, the case ought not to be reversed because proof of the conspiracy came at the wrong time. Often, as here, the overt acts of the alleged co-conspirators may go partly to the establishment of the conspiracy. If inadmissible statements are admitted out of order and it develops that no sufficient showing of a conspiracy has been made, the court ought to strike the statements on motion; and if the case cannot stand without them, proper relief ought to be granted at that time.

*State v. Thompson,* 139 N.W.2d at 503.

Secondly, it has been held that evidentiary deficiencies in the state's case may be supplied by a defendant's evidence, should the defendant decide to present testimony. *State v. Watson,* 99 Idaho 694, 587 P.2d 835 (1978). And, finally, where a defendant contests the sufficiency of the evidence to establish any particular matter, the court on appeal can consider the sufficiency of the evidence on the record as a whole, and not just the sufficiency of the state's case. *Id.*

Viewing this record as a whole, we believe there was sufficient evidence, beyond the testimony of McLenna, from which the trial court reasonably could infer that a conspiracy existed to rob and to murder Flory.

### 3. Reliability.

▮ Accordingly, we turn to Brooks's contention that even if a conspiracy were proved, there was an insufficient showing of reliability of McLenna's testimony as a condition for admission of the testimony. He argues that he was denied the right to contest the reliability of the conversations reported by McLenna, because the parties to those conversations (with the exception of McLenna) were not called as witnesses by the state and were therefore not subject to cross-examination by Brooks. Contrary to Brooks's assertion, we find no requirement that "reliability" of McLenna's testimony had to be established before admission of his testimony concerning the conversations.

▮ This is not a case where the co-conspirator, whose reliability is in question, made out-of-court statements. *Compare State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971). Rather, the co-conspirator—McLenna—whose reliability is in question, made his statements in the form of testimony in the courtroom. His reliability as a witness could be, and was, tested by cross-examination and evaluated by the jury. As noted by the United States Supreme Court in *Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970),

> [t]he hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of the fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to a cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.

Consequently, there was no requirement that the reliability of McLenna's testimony be established before it was admitted in evidence. We conclude that the co-conspirator exception to the hearsay rule was applicable to McLenna's testimony and the testimony was properly received in evidence.

### III. CORROBORATION OF TESTIMONY OF AN ACCOMPLICE

Brooks next contends that the trial court erred in refusing to grant his motion for judgment of acquittal at the close of the state's case-in-chief. His motion was predicated on the failure of the state to meet its burden of proof concerning corroboration of the testimony of an accomplice—McLenna.[1]

After Brooks's motion for acquittal was denied, Brooks then presented his defense, by calling Esquivel as a witness. Brooks then rested his case. The state presented no rebuttal and the case was given to the jury. Brooks's motion for acquittal was not renewed at the close of the case before it was submitted to the jury.

▮ Under the procedure followed in this case, we decline to entertain Brooks's contention that the trial court committed error in regard to the motion to acquit. It is well settled in Idaho that when a defendant introduces evidence in defense of his case, he waives any objection to the denial of his motion to acquit at the close of the state's case, and waives his right to assign as error on appeal the order overruling his motion. *State v. Watson,* 99 Idaho 694, 698, 587 P.2d 835, 839 (1978); *Territory v. Neilson,* 2 Idaho 614, 617, 23 P. 537, 538 (1890). *See also* 84 J. Moore, Moore's Federal Practice ¶¶ 29.01–.09 (Thompson 1973); 2 C. Wright, Federal Practice and Procedure § 463 (2d ed. 1982).

---

1. I.C. § 19–2117 provides:

A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.

## IV. REQUESTED INSTRUCTION REGARDING ACCOMPLICE

The next issue raised by Brooks concerns the trial court's refusal to instruct the jury that, as a matter of law, Brooks's witness, Mitch Esquivel, was an accomplice. Esquivel was the only witness called by Brooks and was one of the boys whose case had been adjudicated in juvenile court. Prior to questioning Esquivel, defense counsel moved to have the trial court instruct the jury that Esquivel was an accomplice in the robbery and murder. Defense counsel believed McLenna's testimony had not been sufficiently corroborated, and he did not want the jury to use Esquivel's testimony for corroboration. An accomplice can neither corroborate himself nor another accomplice to sustain a conviction within the requirements of I.C. § 19-2117. *State v. Rose,* 75 Idaho 59, 64, 267 P.2d 109, 112 (1954).

Before Esquivel testified, the trial court heard defense counsel's offer of proof regarding this motion. Defense counsel stated that Esquivel would testify that he had pled guilty to aiding and abetting voluntary manslaughter,[2] in a plea bargain, in return for cooperating with the prosecution of the other boys involved; that he was involved with Brooks, Wolf and McLenna in planning the robbery-murder; that he had followed the other three boys to Flory's house on June 3, but refused to enter the house; that he was waiting outside when the other boys came back out with the stolen money; and that he received a share of the money. He would deny any direct participation in the robbery or murder. He would not admit to aiding or encouraging the commission of the crime nor any other involvement.

The trial court refused to rule as a matter of law that Esquivel was an accomplice, and therefore declined specifically to instruct the jury as requested, leaving the matter to the jury's determination. Brooks urges us to hold this refusal of the requested instruction to be error, and to reverse the conviction because he was denied the protection of I.C. § 19-2117.

The definition of an accomplice in Idaho is quite clear.

An "accomplice" is a person concerned in the commission of a crime, whether he directly participates in the commission of the act constituting the offense or aids and abets in its commission. . . . [Citations omitted].

. . . . .

Mere presence at, acquiescence in, or silent consent to the commission of an offense is not, in the absence of a duty to act, legally sufficient, however reprehensible it may be, to constitute one a principal, an accessory, or aider and abettor, or an accomplice. An accomplice is one who is joined or united with another; one of several concerned in a felony; an associate in a crime; one who co-operates, aids or assists in committing it. [Citations omitted.]

*State v. Emmons,* 94 Idaho 605, 608, 495 P.2d 11, 14 (1972).

For the purpose of Brooks's contention of error, some aiding, abetting or actual encouragement on the person's part is essential to make that person an accomplice. *State v. Grant,* 26 Idaho 189, 197, 140 P. 959, 962 (1914). Mere acquiescence in, or silent consent to the commission of an offense on the part of a bystander, however reprehensible the crime may be, is not sufficient to make one an accomplice. *State v. Sensenig,* 95 Idaho 218, 506 P.2d 115 (1973). Where there are facts in dispute or in conflict which raise a genuine issue as to whether a witness is indeed an accomplice, the court must submit that issue to the jury for resolution. *State v. Emmons,* 94 Idaho at 608, 495 P.2d at 14.

McLenna had earlier testified during trial that Esquivel went into Flory's house and held Flory's legs down to the bed when the boys were killing him. Esquivel refuted

---

**2.** We note that Esquivel did not actually plead guilty to voluntary manslaughter; rather, he admitted the charges in the Youth Rehabilitation Act petition filed against him, which brought him within the purview of the Act.

this, claiming he never went into the house. He claimed his only involvement was that of a bystander who received a share of the stolen money in return for a promise not to ever talk about the incident. He also claimed he never encouraged the others in the commission of the crime.

■ We hold that the trial court did not err. The question whether Esquivel was an accomplice was for the jury to decide upon conflicting evidence. We do not view the fact of Esquivel's admission in juvenile court as making him an accomplice *per se,* in light of his denial of participation or encouragement in the crime. Because a dispute about whether Esquivel was an accomplice existed, raising an issue of fact, the matter was properly given to the jury by the trial court.

## V. STATEMENT IN OPENING ARGUMENT

■ Brooks also contends that remarks made by the prosecutor in opening argument regarding the expected testimony of a witness, Nick Alonzo, who later recanted that testimony, was so prejudicial as to deny his right to a fair trial. At the close of the state's case-in-chief, Brooks moved for mistrial arguing the prejudicial effect of the prosecutor's statements on his right to a fair trial. The trial court denied the motion for mistrial, but gave a curative instruction to the jury that they should disregard the specific complained of statements.[3]

The purpose and scope of opening argument was addressed in *State v. Griffith,* 97 Idaho 52, 539 P.2d 604 (1975). There the court said:

[o]pening statements serve to inform the jury of the issues of the case and briefly outline the evidence each litigant intends to introduce to support his allegations or defenses, as the case may be. While counsel should be allowed latitude in making an opening statement, the trial court may limit the scope of that statement in the exercise of its discretion. Generally, opening remarks should be confined to a brief summary of evidence counsel expects to introduce on behalf of his client's case-in-chief. Counsel should not at that time attempt to impeach or otherwise argue the merits of evidence that the opposing side has or will present.

*Id.* at 56, 539 P.2d at 608.

The disputed remarks of the prosecutor and an ensuing colloquy are as follows:

PROSECUTOR: Lastly we will have one of the persons who was celled with Mr. Brooks during the time period awaiting trial, served time in the Ada County Jail with him. Nick Alonzo will tell you that one hot evening during the summer he was in the same cell with Rory Brooks; neither of them could sleep, so they sat up and talked. One of the things they talked about was the robbery and murder of Henry Flory. Nick Alonzo will tell you that Rory told him—

DEFENSE COUNSEL: Objection, your honor. I object to the state outlining any alleged statements from the defendant without foundation.

THE COURT: Overrule the objection. He may make the opening statement.

PROSECUTOR: Thank you, your honor. Nick Alonzo will tell you while they were sitting up, Mr. Brooks outlined the facts, told him who the participants were, how they had planned and executed this murder. Thank you.

During the course of the trial, Nick Alonzo was called as a witness by the state. Prior to his testimony, the court removed the jury and required the prosecutor to question Alonzo as he would before the jury, because defense counsel had been only

---

**3.** The court gave a general instruction stating "you must not consider as evidence any statement of counsel made during the trial" and then gave the following specific instruction:

You are specifically instructed to disregard the statements of the prosecutor at the opening of the State's case concerning testimony to be given by the witness, Nick Alonzo. Those statements are not evidence and may not be considered by you.

recently notified that Alonzo would testify. Alonzo had given a taped statement to a police detective. To the surprise of the prosecutor, Alonzo recanted those statements, maintaining that he had lied when the statements were made to the detective. Alonzo said the story was made up, based on rumors he had heard while incarcerated with Brooks; he disclosed that Brooks never spoke to him about the robbery and murder incident.

There is no indication in the record that the prosecutor had any suspicion that Alonzo would recant his statements. The opening remarks of the prosecutor regarding the expected testimony accurately described the taped statement made by Alonzo. The question now presented is whether the remarks were so prejudicial as to deny Brooks's right to a fair trial, in light of the circumstance that evidence supporting those remarks was never presented to the jury in the trial.

This issue was addressed by the United States Supreme Court in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). There Frazier had been convicted of second degree murder in an Oregon State Court. His conviction was affirmed on appeal. *See State v. Frazier*, 245 Or. 4, 418 P.2d 841 (1966). He then petitioned for writ of habeas corpus in the federal judicial system and his case was reviewed on certiorari to the Supreme Court.

One of Frazier's claims for relief was that the prosecutor had informed the jury, in his opening statement at trial, that a co-defendant, Rawls, would testify, and the prosecutor summarized the expected testimony to the jury. The witness, Rawls, thereafter refused to testify, asserting his privilege against self-incrimination. The trial court gave a limiting instruction to the jury, informing them that the opening statement of the prosecutor should not be considered as evidence. In view of this record, the Supreme Court stated:

> [i]t may be that some remarks included in an opening or closing statement could be

so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.

*Frazier v. Cupp*, 394 U.S. at 736, 89 S.Ct. at 1423.

We believe the Supreme Court's observations in *Frazier* are applicable to this case. Here the prosecutor made no more than an objective summary of evidence he reasonably expected to produce. Any potential for misleading the jury was diminished by the witness's repudiation of the testimony he was expected to give. In any event, both general and specific limiting instructions were given by the trial judge to the jury. We cannot conclude that Brooks was prejudiced by this procedure. Under these circumstances, we hold that the trial court did not err in denying Brooks's motion for a mistrial predicated upon the prosecutor's opening statement and the failure of Alonzo to testify as outlined by the prosecutor.

## VI. SENTENCE

■ Finally, Brooks contends that the trial court abused its discretion by imposing an indeterminate sentence of twenty years. The sole basis for his contention is that his youthful age of seventeen at the time of the incident "taints the propriety of sentencing such a young defendant for so long a time."

This sentence was within the limit prescribed by statute.[4] We have held that a term of confinement is reasonable, and not excessive, to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting

---

4. The maximum sentence for second degree murder is life imprisonment, I.C. § 18–4004.

The twenty year sentence imposed on Brooks is within that maximum.

society and to achieve any related goals of deterrence, rehabilitation or retribution applicable to a given case. *State v. Toohill,* 103 Idaho 565, 650 P.2d 707 (Ct.App.1982).

Moreover, we have held in *State v. Reinke,* 103 Idaho 771, 653 P.2d 1183 (Ct. App.1982) that a substantial term of imprisonment will not be overturned solely because of the youthful age of the offender. We conclude that Brooks has not made a sufficient showing that his sentence is excessive and it will not be disturbed.

We affirm both the conviction and the sentence of Rory Brooks.

SWANSTROM, J., concurs.

BURNETT, Judge, specially concurring.

I join the court in affirming the conviction and sentence under review. However, I believe two warning flags should be posted along the road leading to that conclusion.

I

The first flag is marked "pretrial publicity." We have declined to disturb the trial judge's exercise of discretion, in denying a motion for change of venue, because the extensive pretrial media coverage in this case was not impassioned, and because there was no unusual difficulty in selecting a jury. Our ruling follows a well established line of Supreme Court decisions in Idaho. However, the criteria in those decisions contemplate extreme situations, characterized by inflammatory news reporting and revelations of bias by large numbers of potential jurors. My concern today is not with extremes. Rather it is with a more subtle, modern phenomenon—incessant exposure to packaged news.

Modern media coverage of news events bears little resemblance to news reporting of decades past. Today, competition for public attention between print and electronic media, and between sources within each medium, is heightened. The sheer volume and intensity of information reaching prospective jurors has taken a quantum leap, especially in urban areas of the state where news marketing techniques are most highly developed. At the same time, the dissemination of information necessarily has become selective. Potential news stories are evaluated, in part, for ease of assembly and anticipated audience interest. The selected stories are edited to meet deadlines, to fit available space, or to fill broadcast time slots. They are, in short, packaged for public consumption.

This process does not, of itself, condemn the media. Most reporters and editors follow high professional standards. The problem is structural, not individual. So long as news stories are forged in the crucibles of time constraints and competition, the packaging process will be with us.

Packaging of the news affects the news itself. When the subject is a criminal case, the process may yield a stream of selected, easily digested news stories, drawn primarily from the police blotter and from other readily available, official sources. Each story typically may carry a summary of previously reported information, to keep the audience oriented on the case. Taken together, such stories are largely repetitive in content but urgent in tone. They reinforce each other and develop a sense of momentum. By the time of trial—when the true test of facts is supposed to begin—prospective jurors already may have absorbed substantial, untested information about the case.

Moreover, a decision by city desk editors or station managers to treat a criminal case as a major, continuing news event may shape the expectations of a reading, watching and listening community. The case becomes a "big story." This elevated profile may profoundly affect the willingness of jurors to serve, and the strived-for impartiality of those who do serve.

In this environment, the potential for external impact upon jury decision-making is subtle but ominous. The impact often takes the form of latent prejudice against the accused person. However, it is also conceivable that if a jury has been conditioned by pretrial publicity to confront a hardened criminal, but instead they find a

human being who acts like an ordinary citizen in the courtroom, the pendulum of feeling may veer the other way. In either event, the result is to distract the jury from a search for truth.

Accordingly, I believe the standards governing change of venue no longer should be limited to impassioned content in news stories, nor to the number of prospective jurors challenged and disqualified for overt expressions of bias. These traditional factors should be viewed in the broader context of jurors' absorption of pretrial information. The fundamental test should be whether the jurors can take a fresh look at the evidence in trial.

I doubt that jurors entirely forget what they have been told before trial, particularly if their exposure to pretrial information has been reinforced by the repetition or intensity found in packaged news. At most, we hope jurors will separate the information absorbed during pretrial publicity from the information presented to them at trial. If a district judge believes that the intrusion of media coverage has been so great that this process of separation is imperiled, sound discretion would indicate a change of venue even if the traditional indicators of potential prejudice are not prominent.

The judge in this case carefully examined the record of pretrial publicity. He did not confine his review to the traditional factors of inflammatory reporting or undue difficulty in selecting a jury. Consequently, although I would have given greater weight to the quantitative impact of publicity in the case—and might have granted a change of venue had I been sitting as the district judge—I do not regard the judge's ruling as an abuse of his discretion.

## II

The second warning flag is marked "the elusive accomplice." In this case one of the witnesses, Mitch Esquivel, had admitted the truth of allegations in a petition under the Youth Rehabilitation Act, charging him as a participant in the robbery-murder of Enrico Flory. Upon that admission his case was adjudicated under the Act. However, when this individual testified in Rory Brooks' trial, the district judge refused to deem him an accomplice. The issue of his participation, for the purpose of determining whether he was an accomplice, was submitted to the jury.

It has not been argued that Esquivel's accomplice status turned upon any factual requirement beyond the allegations admitted in the Youth Rehabilitation Act proceeding. Rather, the contention seems to be that Esquivel's testimony at trial, possibly hedged by self-interest, created an issue of fact concerning his participation. To me, this plainly connotes that an adjudication under the Youth Rehabilitation Act, upon admission to a petition, was not taken at full face value in the district court.

Most criminal cases and youth rehabilitation proceedings are decided upon pleas of guilty to criminal complaints or upon admissions to juvenile petitions. Such pleas or admissions should be made solemnly and accepted carefully. They are too serious to be treated lightly as mere tools of negotiation, or as postures to be adopted for the convenience of the moment. A plea of guilty, or an admission to a petition, means that the allegations are taken to be true. If it means anything less, the truth-seeking objectives of our criminal justice system are in jeopardy.

I believe the district court erred in failing to rule Esquivel an accomplice as a matter of law, based upon his prior admission. Had Esquivel been treated as an accomplice, his testimony could not have been deemed to corroborate that of any other accomplice. However, because there was independent corroborative evidence, concerning unusual expenditure of money by Brooks and the other boys immediately after the robbery-murder, I would not hold the district court's error to be reversible.