873 P.2d 122

**STATE of IDAHO, Plaintiff–Respondent,**

v.

**Robert Richard JONES, Defendant–Appellant.**

**No. 19432.**

Supreme Court of Idaho,
Boise, February 1993 Term.

April 7, 1994.

---

Hamilton, Clark, Michaelson & Drescher, Nampa, for appellant. Mark L. Clark argued.

Larry EchoHawk, Atty. Gen. and Lynn E. Thomas, Deputy Atty. Gen. (argued), Boise, for respondent.

McDEVITT, Chief Justice.

## STATEMENT OF THE CASE

In December 1989, on indictment by a grand jury, Robert Richard Jones ("Jones") was charged with having murdered Troy Vance ("Vance") in June 1979. Charges were initially brought by complaint against Jones and Jose Alfonso Martinez ("Martinez") in October 1980, but were dismissed in February 1982. In October 1989, Sherry Wystrach ("Wystrach"), Jones' former wife, came forward with vital evidence concerning the Vance murder. As a result, Jones, Martinez, Donna Cordell, and Rebecca Spalding were indicted for first degree murder. Wystrach testified at Jones' grand jury indictment.

Jones pled not guilty. Several pretrial hearings were held to resolve Jones' motions for change of venue, for a preliminary hearing concerning the existence of a conspiracy, to dismiss the indictment, to sever, and to independently *voir dire* the jury. The trial court denied the motions for change of venue and for a preliminary hearing. The court also refused to dismiss the indictment.

At trial, the State wove its theory that Jones and Martinez were hired by Donna Cordell to kill Vance for twenty or thirty thousand dollars. Wystrach's testimony was integral to the prosecution's case, providing first-hand knowledge of the conspiracy, its subject matter and payoffs. Wystrach testified that she was present during several meetings between Donna Cordell and Jones at which information and money were exchanged. The trial court allowed testimony concerning the content of the conversations that took place at these meetings under I.R.E. 801(d)(2)(E). Wystrach also testified that Jones surveiled Vance's house in her company. Wystrach explained the relationship between Jones and Martinez as one of business partners in the business of selling drugs.

At the grand jury hearing, Wystrach detailed the murder, stating that late one evening, Jones and Martinez went to Vance's house, overpowered him and shot him in the head. The trial court restricted this testimony at trial, as it was the product of confidential communications made between Wystrach and Jones during their marriage. The murder weapon, which was owned by the victim, was found in a farmer's field across the street from the victim's house. No prints identified as Jones' were on the gun or at the scene of the crime. In fact, there was absolutely no forensic evidence to connect Jones to the crime.

Wystrach was adjudged by the trial court as a matter of law to be an accomplice to the crime and the court's instruction warned the jury to take that fact into consideration. Wystrach's testimony was corroborated by that of Martinez' girlfriend, Rebecca Spalding, who testified that Martinez and appellant would leave the house each evening at the same time and return at the same time except for the night of the murder, when they returned much later than usual. Rebecca Spalding also testified that on that night, Martinez returned home and announced that he would be leaving immediately for Mexico. Jones objected to this testimony but it was ruled admissible under I.R.E. 801(d)(2)(E). The trial court ruled that the conspiracy was not complete until the final payment was made, and Martinez' statement was uttered before finalization. Wystrach's testimony

was further corroborated by that of one George Florence placing Jones near the scene of the crime, and that of a jailhouse colleague of Jones' who testified that appellant confessed the murder to him.

The defense counsel strove to impeach Wystrach in order to dissolve the foundation of the State's case. Defense counsel introduced evidence, both extrinsically and via cross-examination, of her prior alcohol and drug abuse, her failed relationships, her vindictiveness, her propensity to lie and become confused or forgetful, and the immunity granted her by the State. Moreover, defense counsel constructed its own theory of the murder, establishing a different time of death to coincide with Jones' firm alibi.

At the conclusion of the trial, on December 13, 1990, the jury returned a verdict of guilty. At the sentencing hearing, the State presented evidence to show that Jones deserved the death penalty. Jones presented several letters of reference to rebut the State's evidence, and also submitted corrections to the presentence report. In addition, Jones introduced evidence that marijuana was being grown in Wystrach's present residence to further impeach her credibility at the hearing. Jones was sentenced to life imprisonment and filed an appeal to this Court.

The issues that this Court must address include:

I. Whether Jones was prejudiced in the grand jury proceedings by the use of false, misleading, and privileged testimony such that the indictment should be dismissed.

II. Whether the trial court erred in denying Jones' motion for a change of venue.

III. Whether the trial court erred in ruling on Jones' motions concerning sufficient independent proof of a conspiracy to invoke I.R.E. 801(d)(2)(E).

IV. Whether there is sufficient evidence to corroborate the testimony of accomplice Wystrach to support the guilty verdict.

V. Whether Idaho or Washington law is applicable to the issue of admissibility of a taped telephone conversation between Jones and Wystrach across state lines.

VI. Whether certain nonverbal actions that took place between Jones and Wystrach during their marriage are protected under the canopy of the marital privilege.

VII. Whether evidence of uncharged crimes of Jones was erroneously admitted by the trial court under I.R.E. 404(b).

VIII. Whether testimony of an undisclosed witness should have been excluded by the trial court.

IX. Whether the jury was properly instructed.

X. Whether the trial court conducted a fair sentencing hearing.

## ANALYSIS

### I.

### MOTION TO DISMISS THE GRAND JURY INDICTMENT

Jones first argues that during the grand jury proceedings, the prosecuting attorney deliberately elicited and allowed illegal and misleading testimony from its key witness, Wystrach. The illegal testimony allegedly involved hearsay and testimony in violation of Jones' marital privilege under I.R.E. 504(a). The false and misleading testimony allegedly concerned evidence of a hair found at the crime scene purportedly matching Jones' but later stipulated by the prosecution to be the victim's. Jones further contends that the indictment process was also prejudiced by the admission of testimony alleging other irrelevant uncharged crimes of Jones. Jones asks this Court to dismiss the indictment because this alleged prosecutorial misconduct violated his right to due process by denying him his right to have an impartial and independent grand jury determine probable cause.

The law governing grand jury indictments derives from numerous statutes and rules. Idaho Code § 19-1107 states that "[t]he grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury." Idaho Code § 19-1105 describes the type of evidence the jury may consider:

In the investigation of a charge for the purpose of either presentment or indictment, the grand jury can receive any evidence that is given by witnesses produced and sworn before them except as hereinafter provided, furnished by legal documentary evidence, the deposition of a witness in the cases provided by this code or legally admissible hearsay.

Idaho Criminal Rule 6(f) states that "[i]n the investigation of a charge for the purpose of either presentment or indictment, the grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence." Section (h) states that "[i]f it appears to the grand jury after evidence has been laid before them that there is probable cause to believe an offense has been committed and the accused committed it, the jury ought to find an indictment." I.C.R. 6(h).

■ Based upon Jones' allegations in this case, our inquiry into the propriety of the grand jury proceeding is two-fold. First, we must determine whether, independent of any inadmissible evidence, the grand jury received legally sufficient evidence to support a finding of probable cause. *State v. Edmonson*, 113 Idaho 230, 236, 743 P.2d 459, 465 (1987). Second, we must dismiss the indictment if, despite an adequate finding of probable cause, the prosecutorial misconduct in submitting the illegal evidence was so egregious as to be prejudicial. *Id.* at 237, 743 P.2d at 466.

■ After a careful review of the transcript of the grand jury proceeding, we agree with the trial court's conclusion that illegal evidence was received by the grand jury in the form of testimony concerning privileged marital communications and uncharged crimes. Wystrach testified, in violation of I.R.E. 504, as to a confidential conversation that occurred between her and Jones, her husband, immediately after the murder of Troy Vance. In addition, Wystrach testified, in violation of I.R.E. 404(b) and 802, as to uncharged burglaries and at least one other murder allegedly committed by Jones and Martinez. Although it is clear that this testimony should not have been elicited by the prosecutor before the grand jury, it is equal-

ly apparent that, independent of this illegal evidence, there is sufficient legal evidence to support the indictment. The grand jury had before it over forty pages of testimony from Wystrach describing the events preceding, during, and following the murder, including a detailed summary of meetings that took place between Donna Cordell, Jones, and Wystrach at which information concerning Vance and the payment of money was disclosed, as well as surveillance of the Vance property by Jones and Wystrach. Wystrach also testified about Jones' and Martinez' preparations on the night of the murder, about their absence from home during the critical hours of the murder, and about the disposition of the final payoff received by Wystrach at a final meeting with Cordell. In addition, George Florence offered testimony placing Jones near the crime scene shortly before the murder occurred. This is sufficient evidence to support a finding of probable cause and therefore the improperly admitted evidence does not overturn the indictment.

We now turn to the second prong of our inquiry. This Court in *Edmonson* held that "in order to be entitled to dismissal of an indictment on due process grounds, the defendant must affirmatively show prejudice caused by the misconduct." *Edmonson* at 237, 743 P.2d at 466. Specifically, the defendant must show that, but for the illegal evidence, he would not have been indicted. *Id.* In *Edmonson*, the defendant took exception to the prosecutors comments regarding the credibility of witnesses and the weight and sufficiency of the evidence. The *Edmonson* court, balancing the gravity and seriousness of the misconduct with the sufficiency of the evidence supporting the probable cause finding under the totality of the circumstances, found the misconduct to be so insignificant as to obviate the need to second-guess the grand jury.

■ In the instant case, although we do not find the prosecutor's misconduct in revealing the privileged and hearsay testimony to be as insignificant, we also do not agree with the trial court's conclusion that such misconduct was prejudicial according to the "but for" test announced in *Edmonson*. Be-

cause there is independent legal evidence to support a finding of probable cause and because the totality of the circumstances at the grand jury proceeding do not demonstrate prejudice, there is no basis for dismissal of the indictment.

## II.

### MOTION FOR CHANGE OF VENUE

■ Jones next argues that the trial court erred in refusing to grant his motion for change of venue because no prospective juror in the county could possibly have rendered an unbiased verdict. Jones bases this assertion on several factors. First, The victim in this case was a prominent Caldwell businessman. Consequently, at the time when Jones was first accused of the murder in 1980, a veritable flood of publicity heralded the events of the prosecutor's investigation. This was a high profile case in which the public interest subsided only during the interim years between the original and second investigations. Numerous stories were aired both in 1980, and again in 1989, alluding to Jones and his co-defendants. Second, several attorney affiants stated that the pretrial publicity made it impossible for Jones to obtain a fair trial in Canyon County. Third, Jones spent a majority of his peremptory challenges on jurors with extensive knowledge of the case. Finally, an examination of the transcript shows that most of the veniremen had been exposed to and digested media coverage of the Vance murder.

■ A motion to change the venue of a criminal trial is addressed to the sound discretion of the trial court. *State v. Bainbridge,* 108 Idaho 273, 276–77, 698 P.2d 335, 338–39 (1985); *State v. Needs,* 99 Idaho 883, 890, 591 P.2d 130, 137 (1979). Well-settled case law holds that "where it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, refusal to grant a change of venue is not a ground for reversal." *State v. Thomas,* 94 Idaho 430, 432, 489 P.2d 1310, 1312 (1971). *See also Bainbridge,* 108 Idaho at 277, 698 P.2d at 339; *Needs,* 99 Idaho at 890, 591 P.2d at 137. Factors to consider in determining whether the defendant has received a fair trial, and thus whether an abuse of discretion has occurred, are the existence of affidavits indicating prejudice in the community; testimony at *voir dire* as to whether any juror had formed an opinion of the defendant's guilt or innocence based on pretrial publicity; whether the defendant challenged for cause any of the jurors finally selected; the nature and content of the pretrial publicity; the length of time elapsed between the pretrial publicity and the trial; and any assurances given by the jurors themselves concerning their impartiality. *Needs,* 99 Idaho at 890–91, 591 P.2d at 137–38.

Our review of the record reveals that a jury was selected from Canyon County without significant difficulty. Jones did introduce affidavits opining that he could not receive a fair trial in Canyon County. Jones also submitted news articles reflecting media coverage naming him as the defendant published within six months of his trial. However, the articles contained only factual accounts of events then occurring and were not of an inflammatory nature. Furthermore, jurors were questioned extensively and those ultimately selected indicated absolutely no hesitancy in affirming their impartiality and lack of prefabricated opinion. Finally, not one of the final jurors was challenged for cause by Jones. Based upon the foregoing, we hold that the trial court did not abuse its discretion in denying the motion for a change of venue.

■ In the alternative, Jones challenges the trial court's denial of his motion for a sequestered voir dire. In light of our holding concerning the motion for change of venue, we hold that a sequestered voir dire was not necessary and it was not error for the trial court to deny the motion.

## III.

### MOTIONS CONCERNING PROOF OF A CONSPIRACY

■ Jones urges this Court to adopt the procedure of allowing a defendant the opportunity to have a pretrial hearing to determine whether there is sufficient independent proof of a conspiracy to invoke the co-conspirator

exception to the hearsay rule. This procedural process has been denominated a "*James* hearing" based on the holding in *United States v. James*, 590 F.2d 575 (5th Cir.1979), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). We decline appellant's invitation. According to the existing law in this State, the trial court has discretion to admit statements of a co-conspirator "made in pursuance of a conspiracy if there is some evidence of the conspiracy or a sufficient offer of proof of its existence." *State v. Hoffman*, 123 Idaho 638, 642, 851 P.2d 934, 938 (1993), citing *State v. Caudill*, 109 Idaho 222, 706 P.2d 456 (1985); *State v. So*, 71 Idaho 324, 231 P.2d 734 (1951).

■■■ Jones argues that the trial court erroneously admitted hearsay statements of Martinez through the testimony of Rebecca Spalding, under I.R.E. 801(d)(2)(E) without a finding of independent evidence of a conspiracy. Once again, Idaho law does not require contemporaneous independent proof of a conspiracy. Idaho law simply requires that there be some evidence of conspiracy or promise of its production, before the court can admit evidence of statements made in furtherance of the conspiracy under I.R.E. 801(d)(2)(E). *Id.* We will not disturb a trial court's decision to admit statements so long as there is "sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy." *Hoffman*, 123 Idaho at 642, 851 P.2d at 938 (citing *State v. Brooks*, 103 Idaho 892, 901, 655 P.2d 99, 108 (Ct.App.1982)).

Looking at the record as a whole, independent of the statements of Jones, Martinez, and Donna Cordell, there is sufficient evidence to permit the trial court reasonably to infer that a conspiracy existed between the three. Wystrach's testimony clearly establishes the conspiracy. Thus, all statements by any of the co-conspirators made during and in furtherance of the conspiracy are admissible against each under I.R.E. 801(d)(2)(E). Jones further argues that, if there was any conspiracy at all, it was for the murder of Vance, which murder was completed before Martinez' statements to which Spalding testified. Thus, Jones contends, the statements were not made in furtherance of the conspiracy and do not qualify for admission under 801(d)(2)(E). We disagree. The trial court specifically found that the conspiracy providing the springboard for admitting Martinez' statements under 801(d)(2)(E) was not simply for the murder of Vance, but was for the paid murder of Vance. The trial court further found that the conspiracy did not end until the final payment had been made, and, because the evidence showed that Martinez' statements were made before the final payment, the statements were admissible under 801(d)(2)(E). We hold that there is sufficient evidence to support the trial court's ruling that the conspiracy was for the paid murder of Vance. (Tr. vol. IV at 834.) Therefore, the conspiracy was not complete until final payment was made, and all statements made in furtherance of the conspiracy until final payment are admissible. *Cf. State v. Caudill*, 109 Idaho 222, 226, 706 P.2d 456, 460 (1985).

■■■ Jones also asserts that, because the underlying crime of conspiracy was barred by the statute of limitation, hearsay statements in furtherance of that crime are also barred. This argument suffers at least one internal fallacy. It confuses "conspiracy" as a concept of substantive criminal law with "conspiracy" as part of an evidentiary principle, and burdens the latter with all the formal requirements of the former. The ninth circuit has concisely articulated the proper approach to the issue:

> [T]he differences between what must be proved to invoke the hearsay exception and what must be proved in order to convict a person of the crime of conspiracy, as well as the difference in burden of proof, mean that neither collateral estoppel nor res judicata automatically bars the use of statements by a person who has been acquitted of the crime of conspiracy.

*United States v. Peralta*, 941 F.2d 1003, 1006 (9th Cir.1991) quoting *United States v. Gil*, 604 F.2d 546, 549 (7th Cir.1979). *See also United States v. Carroll*, 860 F.2d 500, 506 (1st Cir.1988); *United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983); *United States v. Stanchich*, 550 F.2d 1294, 1299 (2nd Cir.1977); *United States v. Cravero*, 545 F.2d

406, 419 (5th Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *United States v. Bass*, 472 F.2d 207, 213–14 (8th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). By the same token, the statute of limitation for the crime of conspiracy does not automatically bar the use of statements by a person who cannot be charged with the crime of conspiracy due to the operation of the statute of limitation. The substantive criminal law of conspiracy, though it overlaps in many areas, simply has no application to this evidentiary principle. Thus, once there is some evidence of a conspiracy or promise of its production, any statement made by a co-conspirator during the course of and in furtherance of the conspiracy are admissible. "[I]t makes no difference whether the declarant or any other partner in crime could actually be tried, convicted and punished for the crime of conspiracy." *United States v. Gil*, 604 F.2d 546, 549 (7th Cir.1979).

## IV.

### CORROBORATION OF ACCOMPLICE TESTIMONY

■■■■ Jones next contends that the trial court erroneously admitted the uncorroborated testimony of accomplice Wystrach. Idaho Code § 19–2117 states that:

A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.

I.C. § 19–2117. When it appears as a matter of law that a witness is an accomplice of the defendant, the court should so instruct the jury and should also instruct them concern-

ing the necessary corroboration of his testimony. *State v. Wilson*, 93 Idaho 194, 200, 457 P.2d 433, 439 (1969). Corroboration of an accomplice need only connect the accused with the crime, it may be slight, and need only go to one material fact or it may be entirely circumstantial. *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984); *State v. Mundell*, 66 Idaho 339, 158 P.2d 799 (1945).

The trial court adjudged Wystrach to be an accomplice as a matter of law. We agree with this conclusion. Accordingly, the trial court properly gave a limiting instruction concerning accomplice testimony.[1] The record reveals ample evidence to sustain an implicit jury finding of sufficient corroborating evidence. Corroborating evidence which the jury could easily have found tending to connect Jones with the murder of Vance includes the testimonies of Florence, Tisdale, and Spalding, none of whom were accomplices.

## V.

### SUPPRESSION OF THE TAPED INTERSTATE TELEPHONE CONVERSATION

■■■■ Jones next argues that the trial court erroneously applied Idaho and federal law instead of Washington law in determining the admissibility of a taped telephone conversation between Jones in Washington and Wystrach in Idaho. Washington law specifically prohibits the recording of telephone conversation between "points within and without the state" absent the consent of both parties. R.C.W. 9.73.030(1)(a).[2] Idaho and federal law require the consent of only one party. The Idaho Supreme Court has adopted the "most significant contacts" test to determine choice of law issues. *See Johnson v. Pischke*, 108 Idaho 397, 399–400, 700 P.2d 19, 21–22 (1985). The "significant con-

---

1. The trial court instructed the jury that "the testimony of an accomplice which tends to incriminate the defendant, if any, ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but should give it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case ... testimony of an accomplice must be

corroborated by other evidence which tends to connect the defendant with the commission of the crime."

2. In *State v. Williams*, 94 Wash.2d 531, 617 P.2d 1012 (1980), the Washington Supreme Court held that the federal law is not preemptive in this area.

tacts" test entails a two-step process. First, the court must examine certain significant "contacts" with each state having an interest in the issue according to the relative importance of the contacts to the particular issue. Second, the court must examine the contacts in light of the principles underlying the area of law and the law of the relative jurisdictions.

In this case the call originated in Idaho and was supervised and recorded by Idaho police officials in order to obtain evidence concerning a murder that occurred in Idaho. The call was placed to an inhabitant of Washington. Under the first prong of the test, as to the issue of regulating the interstate telephone conversation, the contacts in Idaho significantly outweigh those in Washington.

Under the second prong of the test we are required first to weigh the relevant policies of each involved jurisdiction. The Washington law is meant to protect the privacy of its citizens. The Idaho law balances the need to protect the privacy of its citizens against the social need to provide reasonable means of procuring evidence in prosecution of crimes committed in Idaho. Although the Washington law provides heightened protections to individuals, the Idaho law provides significant protection for all private individuals, regardless of state citizenship, by requiring the consent of at least one party. Thus, both Idaho and Washington policies are furthered by applying Idaho rather than Washington law to the issue.

We next consider the principle promoting the protection of justified expectations. Individuals expect their telephone conversations to be private. This expectation would be served by the application of either Washington or Idaho law. We must also consider the basic policies underlying the particular field of the law. In this case, significant privacy interests underlie limiting governmental intrusion into telephone conversations. Once again, this privacy interest is adequately protected by either state's statute. Finally, the

court must weigh the need for certainty, predictability, and uniformity of result, in the determination of the law to be applied. Once again, the application of the Idaho statute more aptly achieves these principles. An analysis of Washington law reveals no case in which Washington exercised its prohibition against Idaho officials taping calls originating in Idaho, nor that require suppression of evidence obtained by such taping. Allowing Idaho officials to rely on an Idaho statute concerning taped telephone conversations originating within its borders promotes facility, certainty, predictability, and uniformity of result. Accordingly, we hold that the trial court properly applied Idaho law to the suppression issue.

## VI.

### PRIVILEGED TESTIMONY

 Jones contends that the trial court erroneously admitted testimony concerning two "marital acts" engaged in by Jones and Wystrach, in violation of the marital privilege.[3] *State v. Fowler*, 101 Idaho 546, 550, 617 P.2d 850, 854 (1980). The first incident involves the alleged surveillance of the Vance property, and the second entails a "meaningful glance" exchanged at the viewing of a news story on the murder. We hold that the trial court correctly ruled that the privilege does not protect the two nonverbal acts. The trial court properly excluded from evidence all confidential communications that occurred between Jones and Wystrach during their marriage. The surveillance of the Vance property by Wystrach and Jones cannot be regarded as a marital communication any more than testimony concerning a spouse's possessions or whereabouts can be. *Id.*, 101 Idaho at 550, 617 P.2d at 854. The trial court properly recognized this fact. By contrast, the "meaningful glance" that passed between Wystrach and appellant, although communicative, occurred in the presence of

---

3. The marital privilege is provided by I.R.E. 504. It states that:
 A communication is "confidential" if it is made during marriage privately by any person to his or her spouse, and is not intended for disclosure to any other person.

.... A party in an action or proceeding has a privilege to prevent testimony as to any confidential communication between the party and his or her spouse made during the marriage. I.R.E. 504.

Wystrach's parents and was therefore far from confidential.

## VII.

### EVIDENCE OF UNCHARGED CRIMES

 Jones asserts that the trial court erred in allowing testimony of uncharged crimes of appellant relating to an unspecified murder and to the sale, possession, use and delivery of controlled substances under I.R.E. 403, and *State v. Arledge*, 119 Idaho 584, 808 P.2d 1329 (Ct.App.1991). We disagree with respect to the testimony regarding the sale, possession, use and delivery of a controlled substance. This testimony is admissible under I.R.E. 404(b) which allows evidence of prior wrongs to show motive, intent or plan. However, the testimony concerning the unspecified murder was erroneously admitted according to I.R.E. 403. The testimony of the "unspecified" murder came from Wystrach's psychologist Dr. Hamblin. It was offered for purposes of rebutting Jones' attempt to impeach the credibility of Wystrach. The doctor's testimony referred to a notation he made that Wystrach admitted to him during a counseling session that Jones had "killed someone," presumably referring to Vance. The court allowed the testimony as a prior consistent statement to rebut charges of recent fabrication. Because Wystrach's inference is vague as to the victim, the statement does not qualify as a prior consistent statement for lack of specificity and should have been suppressed as unduly prejudicial. The error in admitting the statement, nonetheless, is harmless according to the standard set forth in *State v. Petrogalli*, 34 Idaho 232, 200 P. 119 (1921), and *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991), and therefore does not require reversal. I.C.R. 52; *State v. Rice*, 7 Idaho 762, 66 P. 87 (1901). The standard for determining whether error is harmless is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction and that the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Pizzuto*, 119 Idaho at 762, 810 P.2d at 700 (citation omitted). We conclude that, beyond a reasonable doubt, the evidence of the prior unspecified murder did not influence the jury's verdict. The most that the complained of testimony could have contributed was to bolster the credibility of Wystrach. The jury had ample other opportunity to discern the credibility of Wystrach and weigh it against that of appellant. Therefore, the error is harmless and does not warrant reversal.

## VIII.

### TESTIMONY OF UNDISCLOSED WITNESS

 Jones next argues that the trial court erroneously admitted the testimony of an undisclosed witness, Lisa Squires. The State may call an undisclosed witness when the testimony of the witness only concerns the chain of possession of certain evidence, *State v. Goodrick*, 95 Idaho 773, 777, 519 P.2d 958, 962 (1974), or during rebuttal. The testimony of Lisa Squires fits neither criteria. Ms. Squires was used to establish the chain of custody of the Red Lion Downtowner hotel room registration and charge account signed by Jones. Had the prosecution so confined its examination of Ms. Squires, the admission of Ms. Squires' testimony would surpass scrutiny under *Goodrick*. However, the State delved further into the episodes surrounding Jones' stay at the Red Lion, eliciting testimony from Ms. Squires concerning the amount of money Jones carried with him. The State justifies the admission of the latter portion of Squires' testimony by characterizing it as rebuttal evidence, emphasizing that the defense cast doubt on Wystrach's credibility by examining her about prior inconsistent testimony under oath denying any involvement on her or Jones' part in the murder, about her bad memory based on drug and alcohol abuse, about her propensity to lie as evidenced by her false rape charge, and about her love/hate affair with Jones. The State asserts that Squires' testimony directly supports Wystrach's testimony on direct examination concerning a recent sojourn between her and appellant at the Red Lion Downtowner in Boise, Idaho, shortly before their breakup and Wystrach's turning state's witness, thereby somewhat rehabilitating Wystrach's

credibility. We disagree. *Goodrick's* first criteria contemplates witnesses called after the opposing party has presented their case to rebut allegations brought to bear by the opposition. Ms. Squires was not a rebuttal witness, but surfaced during the state's case-in-chief. Therefore, her testimony concerning the bankroll Jones carried does not qualify as rebuttal and the trial court committed error in admitting her testimony. However, the error is harmless and does not warrant reversal.

## IX.

## JURY INSTRUCTIONS

 Jones also argues that the trial court erroneously failed to give the jury a *Holder* instruction, asserting that the State's case before the jury consisted solely of circumstantial evidence.[4] Generally:

> In charging the jury, the court must state to them all matters of law necessary for their information. Either party may present to the court any written charge and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused.

I.C. § 19–2132. The question whether the jury was properly instructed is a question of law over which this Court exercises free review. *See Suitts v. First Sec. Bank of Idaho*, 110 Idaho 15, 713 P.2d 1374 (1985). In Idaho, the failure to give a circumstantial evidence instruction, when warranted by the evidence, is reversible error. *State v. Holder*, 100 Idaho 129, 594 P.2d 639 (1979). *Holder* requires a circumstantial instruction to be given when the evidence linking the defendant to the crime charged is entirely circumstantial. *Holder*, 100 Idaho at 133,

594 P.2d at 643. We hold that the trial court properly refused to give a *Holder* instruction, because the case is not based entirely on circumstantial evidence. *State v. Phillips*, 123 Idaho 178, 182, 845 P.2d 1211, 1215 (1993). Direct evidence includes, among other things, the testimony of Tisdale concerning Jones' confession and of Wystrach concerning the conspiracy, the surveillance, and Martinez' drug buy.

 Jones also claims that the trial court erred in allowing an "on or about" instruction in the face of an affirmative alibi, thereby relieving the State's burden to prove each and every element of the crime beyond a reasonable doubt. *State v. Mode*, 57 Wash.2d 829, 834, 360 P.2d 159, 164 (1961).[5] We disagree. The time of death is not an element of the crime and the defense of an alibi for a particular time period does not constructively create such an element. The "on or about" instruction given by the court did not relieve the state of its burden to prove any element.

## X.

## THE SENTENCING HEARING

 Jones also attacks the fairness and neutrality of the sentencing process. Our standard in reviewing sentences is that "[s]entencing is a matter committed to the discretion of the trial judge, and the defendant has the burden of showing a clear abuse thereof on appeal. In exercising that discretion, reasonableness is a fundamental requirement." *State v. Broadhead*, 120 Idaho 141, 144, 814 P.2d 401, 404 (1991) (quoting *State v. Dillon*, 100 Idaho 723, 724, 604 P.2d 737, 738 (1979), *overruled on other grounds*,

4. The proposed instruction reads as follows:

> You are not permitted to find the defendant guilty of the crime charged against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled in a rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt. Also, if the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's

> guilt and the other to his innocence, it is your duty to adopt the interpretation which points to the defendant's innocence.

5. The contested instruction states that:

> When as in this case, it is alleged that the crime charged was committed "on or about a certain date," if the jury finds that the crime was committed, it is not necessary that the proof show that it was committed on that certain date; it is sufficient if the proof shows that the crime was committed on or about that date.

*State v. Brown*, 121 Idaho 385, 394, 825 P.2d 482, 491 (1992). Based on the evidence presented on appeal, it is the opinion of this Court that the process was reasonable and the trial court properly and fairly weighed the evidence. The record demonstrates that the trial court properly entertained and resolved Jones' objections to the presentence report, accommodated all of Jones' mitigating evidence, and evaluated the sum of the evidence before it. We find no abuse of discretion in the sentencing phase of this case.

Based upon the foregoing analysis in sections I through X, we find no merit in Jones' contentions concerning cumulative error and wholly affirm the trial court.

TROUT, J., and SCHROEDER, J., Pro Tem, concur.

BISTLINE, Justice, dissenting in part, concurring in part.

Without commenting on the innocence or guilt of the defendant, this justice respectfully dissents from the majority opinion. Because of the various errors infecting Jones's trial, the Court this day should reverse the judgment and remand for new proceedings. Those errors are enumerated and explained below.

## I. BECAUSE OF PROSECUTORIAL MISCONDUCT DURING THE GRAND JURY INDICTMENT PROCEEDINGS, THE INDICTMENT SHOULD BE DISMISSED.

The grand jury proceeding was fundamentally tainted by the prosecution's introduction of illegal and inadmissible evidence. The majority has concluded that such misconduct does not suffice to dismiss the indictment. I am not so persuaded. The basic question seems to be in determining when "a little" is *too* much.

### A. The Proper Test for Prosecutorial Misconduct in Grand Jury Proceedings

The majority opinion reaches the conclusion that Jones's indictment was legally sufficient because the trial court found that there was sufficient competent evidence to support probable cause, citing *State v. Edmonson*, 113 Idaho 230, 743 P.2d 459 (1987), and because the majority finds that the totality of the circumstances does not establish prejudice.

The majority opinion nobly attempts to make sense of *Edmonson*, a rather contradictory and confusing opinion, at least on the point of misconduct in grand jury proceedings. I write to disagree with the majority's articulation of the "second prong" of the *Edmonson* test, specifically, its discussion of what constitutes "prejudice."

In *Edmonson*, the defendant essentially complained of two transgressions during the grand jury proceedings: one, hearsay adduced in violation of I.C. § 19–1105; and two, prosecutorial misconduct consisting of comments on the sufficiency of the evidence and the credibility of the witnesses. As to the hearsay claim, *Edmonson* held that a finding of probable cause established by admissible evidence is sufficient to overcome the prejudice incurred by hearsay evidence (the "independent probable cause" test). The majority opinion calls the independent probable cause test the "first prong" in determining the propriety of the grand jury indictment proceedings. The independent probable cause test, however, applies only when a defendant claims that inadmissible hearsay (or some other, similar illegal evidence) was introduced. Here, the heart of Jones's claim is that the prosecutor engaged in various types of misconduct, including the introduction of privileged testimony. In that case, the independent probable cause test does not apply.

This leads us to the majority opinion's "second prong." The majority is absolutely correct wherein it holds that this Court must balance the gravity of the misconduct with the sufficiency of the evidence supporting the probable cause. As *Edmonson* instructs,

> To determine whether misconduct gives rise to a dismissal, a reviewing court will have to *balance the gravity and the seriousness of this misconduct with the sufficiency of the evidence supporting the probable cause finding.* At one extreme, the misconduct can be so outrageous that regardless of the extent of probable cause evidence, dismissal will be required. At

the other extreme, the misconduct may be so slight, that it becomes unnecessary to question the independent judgment of the grand jury. In the middle of these extremes, the court must examine the totality of the circumstances to determine whether the indictment should be dismissed.

*Edmonson,* 113 Idaho at 237, 743 P.2d at 466 (emphasis added).[6]

A problem with *Edmonson* is that it sets forth what appear to be two mutually exclusive lines of analysis. The first line of analysis is that defendant must show prejudice in the guise of the but for test (the "but for/prejudice test"), which in reality is nothing more than the independent probable cause test restated: if defendants cannot show that the remaining evidence failed to establish probable cause, they will not be able to show that but for the illegal evidence, they would not have been indicted. The second, antithetical line of analysis is the above quoted paragraph, which sets forth a balancing test in which the reviewing court is to quantify the level of misconduct and the strength of the probable cause evidence (the "quantification test"). These two analyses are mutually exclusive in application because if misconduct is outrageous but probable cause is very strong, according to the but for/prejudice test, the indictment should be upheld. The quantification test, however, expressly precludes such a result. Another illustration of internal inconsistency rather fairly severely where prosecutorial misconduct is strong though not "outrageous," and probable cause very weak, albeit existent. Under the but/for prejudice test, the indictment would survive; under the quantification test, the indictment would have to be dismissed.

Which of these apparently irreconcilable analyses are we to follow? It is clear that the holding of *Edmonson* it is the quantification test; *Edmonson* actually applied the balancing test, determining that the misconduct was so slight that probable cause need not be questioned. On the other hand, the

but for/prejudice test language amounts to mere dicta. Furthermore, the but for/prejudice language is unsupported by Idaho law. In *Edmonson,* we cited cases from New Mexico, Iowa, and Illinois. The only Idaho case cited, *State v. Kruse,* 100 Idaho 877, 606 P.2d 981 (1980), was thoroughly inapposite. The *Edmonson* majority cited *Kruse* to support the statement that "[i]n order to be entitled to dismissal of an indictment on due process grounds, the defendant must affirmatively show prejudice caused by the misconduct"; *Kruse,* however, only dealt with pre-accusatory delay, a complaint wholly different from prosecutorial misconduct during a constitutionally-bestowed grand jury proceeding.

It is thus clear that the majority opinion's analysis should follow the quantification test rather than the but/for prejudice test. Of course, some prejudice must adhere from the complained-of misconduct for this Court to set aside an indictment. A more sensible test of prejudice and one in harmony with *Edmonson's* various strictures is: is there a strong likelihood that the complained-of evidence significantly contribute to the indictment? This test is more in keeping with *Edmonson's* balancing test: if the misconduct was severe, the likelihood that the effect of the misconduct was significant in obtaining an indictment is high, thereby mandating dismissal; if the misconduct was insignificant, as was found to be the case in *Edmonson,* the misconduct probably did not contribute in any significant manner to the indictment. This proposed test for determining prejudice in this particular context also comports with the various concerns underlying the issue of misconduct in grand jury proceedings. On one hand, not every indictment should be dismissed merely because the prosecutor did not dot all the "i" 's and cross all the "t" 's, particularly when the defendant ends up being convicted. On the other hand, we cannot feign ignorance and look away when significant misconduct is involved. Even if prosecutors eventually gain a conviction, it is still vital that they provide a mean-

---

6. In *Edmonson,* this Court held that the prosecutor's misconduct was so insignificant that the sufficiency of the evidence establishing probable cause was irrelevant. 113 Idaho at 237, 743 P.2d at 466.

ingful grand jury proceeding or other, impartial charging procedure, as mandated by the Idaho constitution. *See* IDAHO CONST., Art. I, § 8. The need for prosecutors to comport with the few rules by which they are bound is acute in light of the nature of present day grand jury proceedings. *See generally, State v. Edmonson,* 113 Idaho 230, 743 P.2d 459 (1987) (Bistline, J., dissenting) (discussing history and procedure of grand jury proceedings). Even when grand jury proceedings are according to Idaho laws and procedures they oft-times fall short of what such proceedings were historically intended to be—a protection for defendants to ensure that sufficient probable cause exists to bind defendants over for trial. *Edmonson,* 113 Idaho at 243–245, 743 P.2d at 472–473. There is reason for concern that grand jury proceedings are notoriously the tools of the prosecutors, restrained by very few checks of prosecutorial power. *Edmonson,* 113 Idaho at 246, 743 P.2d at 475 (quoting from *Hawkins v. Superior Court,* 22 Cal.3d 584, 587, 586 P.2d 916, 919 (1978), which in turned quoted a former prosecutor as stating that "[t]oday, the grand jury is the total captive of the prosecutor who, if he is candid, will concede that he can indict anybody, at any time, for almost anything, before any grand jury." Campbell, *Eliminate the Grand Jury* (1973) 64 J.Crim.L. & C. 174.) The prosecutor is free to interrogate any witness called by the grand jury, including potential defendants. *Edmonson,* 113 Idaho at 245, 743 P.2d at 474. Furthermore, these proceedings are closed to all but the prosecutor, witnesses, and grand jurors, meaning that neither defense counsel nor even an impartial judge may be present. *Id.* The few constraints that might check this immense power derive from the Idaho Code (and thereby, certain rules of evidence which it incorporates), the Rules of Professional Conduct,[7] and the Idaho and United States constitutions. Jones's argument, that because prosecutors are bestowed with tremendous power and defendants with none, prosecutors must at least play according to the few rules by which they are constrained,

leaving it clearly up to the trial courts, and on appellate review, this Court to be overseeing referees lest justice not be done, is sound.

### B. The Complained-of Misconduct

How severe is the misconduct and its effect here and is there a likelihood that the misconduct contributed significantly to the grand jury's indictment? To detail the misconduct:

1) The hair. The prosecutor elicited a detective's testimony relative to an FBI test comparing hair taken from the murder scene and from Jones. This testimony was the only direct, physical tie between Jones and the victim's house. The result of the comparison test was a conclusion that two hairs had similar characteristics. The prosecutor did not advise the jury that the FBI, following its test results, had warned that hair comparison is not a means of positive identification. This was so notwithstanding that the detective had informed a questioning grand juror that the odds of such a match were one in several thousand. Ironically, the FBI in fact later determined that the tested hair was actually that of Vance, the victim.

Although the prosecutor may not have had an outright duty to volunteer to the grand jury the FBI's warning as to the reliability, or lack thereof, regarding the hair comparison test as a means of positive identification, that duty matured once a grand juror inquired of a witness as to the import of the test. Having the detective testify as to the probability that the hair was defendant's, and, moreover, failing to supply the jurors with the FBI's limitation, appears to be a dereliction of duty on the part of the prosecutor.

2) The uncharged murder. Wystrach mentioned that she first met Martinez after the "Goody Goodrich murder." The prosecutor then engaged her in the following exchange:

7. The Comment to Rule 3.8 of the Idaho Rules of Professional Conduct reminds prosecutors that they have "the responsibility of a minister of justice and not simply that of an advocate. This

responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilty is decided upon the basis of sufficient evidence."

PROSECUTING ATTORNEY: Now you made a reference to a Goody—Goody Goodrich murder.

WITNESS [WYSTRACH]: Um-hum.

PROSECUTING ATTORNEY: When and where did that occur, if you know?

WITNESS: It happened at their trailer, right outside the door. They came home from a party and he started to walk into the door and somebody shot him, killed him.

Transcript of Grand Jury Proceedings of December 19, 1989, p. 39. Such testimony was clearly prejudicial, substantially outweighing any probative value. The prejudicial nature of the prosecutor's elicitation of testimony about the Goodrich murder is reflected by a grand juror's later questioning:

GRAND JUROR: Had they [Jones and Martinez] been involved in a murder before?

WITNESS [WYSTRACH]: Yes.

GRAND JUROR: Both of them?

WITNESS: Yes.

GRAND JUROR: And they were not found guilty of that one?

WITNESS: No.

GRAND JUROR: Is that the one over at that trailer house in Boise?

WITNESS: That was one of them, yes.

. . . .

GRAND JUROR: And they got out of that one too?

WITNESS: They were never charged.

Transcript of Grand Jury Proceedings of December 19, 1989, p. 91. Presumably the prosecutor stood idly by while this highly prejudicial evidence was being introduced.

3) The privileged testimony. Undoubtedly the most serious, questionable, and likely inexcusable act of misconduct of which Jones complains was the prosecutor's adducing confidential communications from Jones to Wystrach during their marriage *after* her testimony had made it quite clear as to the time when the marriage took place, thus evidencing that such communications were indeed privileged. Because the prosecutor chose to play fast and loose with the Rules of Evidence,[8] the grand jury heard such testimony as the following:

PROSECUTING ATTORNEY: Did you have a conversation with Bob at that time?

WITNESS [WYSTRACH]: Yes.

PROSECUTING ATTORNEY: Would you relate that conversation, please?

WITNESS: I asked him if they had taken care of Troy Vance and he said yeah, that it was over with and that now we'd be set for a long time, meaning we had money to live on again.

PROSECUTING ATTORNEY: Did he describe to you what occurred?

WITNESS: Yes.

PROSECUTING ATTORNEY: Can you tell us what occurred—or what he told you?

WITNESS: He went to the house—they went to the house, and he—and they went through the sliding glass door, they went through the kitchen, for whatever reason, I don't know, and made a mess of that, then they went downstairs, waited for him to

---

**8.** During the hearing on defendant's pretrial dismissal motion, the prosecutor attempted to explain away this breach of the Rules of Evidence by advancing the notion that an exception exists to the marital privilege when the spouses are co-conspirators. The prosecutor argued that public policy supports a reading of the Rules of Evidence wherein I.R.E. 801(d), the co-conspirator hearsay exception, trumps the express provisions of I.R.E. 504 and I.C. § 9–203, governing marital privilege. Even a superficial reading of the two rules of evidence controverts this argument, however. The co-conspirator exception merely provides that what otherwise would be considered inadmissible hearsay is not hearsay, not that a statement qualifying under the co-conspirator exception is per se admissible. But such an exception has no support in the rules of evidence, statutes, or case law of this state. One thing is certain: even if the prosecutor's explanation stemmed from a good faith belief that such an exception exists (rather than an after-the-fact attempt to insulate himself from perfidious acts), grand jury proceedings are not the forum in which to advance new evidentiary theories which appear to be unsupported by the Rules of Evidence, evidentiary statutes, or by case law. Fairness dictates that the proper forum for advancing such dicey theories is in a court of law, whereat the prosecutor may be held in check by defense counsel and by the court. Not surprisingly, the trial court excluded this privileged testimony at trial.

come in, when Vance came home, they tied him up, I would assume they used handcuffs because Bob used handcuffs when he stuck people up, and Al was giving Vance a real bad time and kind of beating him up a little bit and trying to scare him and Vance started begging for his life and started offering Al and Bob money or drugs or whatever they wanted just to, you know, not to hurt him. And Al made, for whatever reason, Bob took kind of orders from Al, and he took the first shot and then Al pulled the second two shots.

Transcript of Grand Jury Proceedings of December 19, 1989, pp. 69–70. It is noteworthy that no other testimony or evidence exists as to where Jones and Martinez were or what they were doing during the murder. Wystrach only testified that she was at the trailer site that entire evening and thus had no knowledge as to the events of the murder except for what Jones told her confidentially.

The instances of misconduct listed above show that the testimony arising from the prosecutor's questioned actions likely had a significant, if not profound, effect on the grand jury. Even though independent probable cause is present on the cold record, such probable cause is not weighty;[9] the complained-of misconduct is. In view of a showing of such clear prejudice and misconduct, dismissal of Jones's indictment is, in this justice's view, mandated.

## II. THE DISTRICT COURT ERRED BY REFUSING JONES'S MOTION FOR JUROR SEQUESTRATION.

The majority summarily concludes that "[i]n light of our holding concerning the motion for change of venue, we hold that a sequestered voir dire was not necessary and it was not error for the trial court to deny the motion." No case law is cited in support of this proposition, which is understandable: there exists no case law holding that the standards for sequestered voir dire and change of venue are identical. Nor indeed should any case so hold. When extensive publicity precedes a trial and there is a rea-

sonable possibility that jurors may be improperly informed by such publicity, it is crucial that sequestered voir dire be allowed so that each potential juror exposed to that publicity may articulate what is known without educating the rest of the venirepersons. Otherwise, it would appear well-nigh impossible to demonstrate the pervasiveness of the publicity, placing the defense in a Catch–22.

It is noteworthy that in most of the cases upholding dismissal of a defendant's motion for change of venue, the district court allowed sequestered voir dire of the witnesses. *See, e.g., State v. Hall,* 111 Idaho 827, 727 P.2d 1255 (Ct.App.1986), *State v. Brooks,* 103 Idaho 892, 655 P.2d 99 (Ct.App.1982). Even if the motion for change of venue in the case *sub judice* was properly denied, the district court abused its discretion in refusing to conduct sequestered voir dire of the jurors, considering that Jones's showing satisfied several of the *Needs* factors (the affidavits and the short lapse of time between the articles and voir dire), as discussed in the majority opinion.

## III. THE JAMES HEARING PROCEDURE SHOULD BE ADOPTED IN IDAHO.

The first problem with Part III of the majority opinion is that it is not at all clear that the law in Idaho as to co-conspirator statements is what the majority declares it to be. This Court has never held that a trial court may admit statements of a co-conspirator prior to proof of the conspiracy being laid before the court. The cases cited in the majority opinion supporting this proposition, *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (1985), and *State v. So,* 71 Idaho 324, 231 P.2d 734 (1951), are not fully apposite. *So* was decided before the Idaho Rules of Evidence, including I.R.E. 801, were adopted; the statement in *Caudill* that "[i]t is not necessary that a formal charge of conspiracy be made against co-conspirators before this exception applies, but is necessary that there be some evidence of conspiracy or promise of its production before the court can admit

---

**9.** One is brought to wonder why the prosecutor felt the need to allow in all sorts of illegal evi-

dence if he had a strong case to begin with.

evidence of statements made in furtherance of the conspiracy" is sheer, unadulterated dicta.[10] 109 Idaho at 226, 706 P.2d at 460.

The second problem with the opinion is the failure of any reasoning to explain why the *James* procedure should not be adopted, at least prospectively. Jones, although he does not argue that *James* hearings are accepted law in this state, does argue that such should be the law. Jones makes a most persuasive case:

> As a matter of public policy the Supreme Court should adopt the procedure of allowing a defendant the opportunity to have such a pre-trial [*James* hearing]. . . . Based upon the following legal scholars and reported cases, we respectfully request that the Idaho Supreme Court adopt a pre-trial "*James* Hearing" procedure when requested by a defendant.
>
> Judge Weinstein and Professor Berger state,
>
>> It is the contention of this treatise that the fair and practicable method of providing protection to the defendant without violating the letter or spirit of the rules lies in insisting on a stringent standard of proof *before* the court admits a co-conspirator statement in a criminal case.
>
> Weinstein, J. and Berger, M., *Weinstein on Evidence*, Section 801(d)(2)(e), at 176 (1981) (emphasis added).
>
> In the same spirit, the United States Court of Appeal for the Fifth Circuit initiated the requirement of a pre-trial hearing at which the predicate for admissibility of any co-conspirator hearsay must be laid,
>
>> Courts have on occasion allowed such statements [i.e., alleged co-conspirator hearsay] to be heard by the jury upon the promise that the prosecutor will "connect it up." Of course, if it is connected up, the defendant suffers no prej-

udice in the order of proof. If, however, the judge should conclude at the end of the trial that proper foundation has not been laid, the defendant will have been prejudiced from the jury's having heard the inadmissible evidence. . . .

> Both because of the "danger" to the defendant if the statement is not connected and because of the inevitable serious waste of time, energy and efficiency when a mistrial is required in order to obviate such danger, we conclude that the present procedure warrants the statement of a preferred order of proof in such a case. The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it *before* admitting declarations of a co-conspirator.

*James, supra,* at 581–82 (emphasis added).

Different courts have at times followed other procedures, but *no trial court has ever been reversed for affording a defendant a James hearing. Appellate courts have,* however, *reversed trial courts that failed to conduct James hearings.* See, e.g., *United States v. Radeker,* 664 F.2d 242 (10th Cir.1981); *United States v. Stipe,* 653 F.2d 446, esp. at 449 (10th Cir.1981).

Leading state courts have come to the same conclusions. In *People v. Montoya,* 753 P.2d 729 (Colo.1988), the Colorado Supreme Court stated:

> The prosecution . . . bears the burden of establishing . . . that the defendant and the declarant were members of a conspiracy and that the declarant's statement was made during the course and in furtherance of the conspiracy.
>
> Although [local rule of evidence] 104(b) authorizes a trial court to admit a co-conspirator's statement conditionally [11]

---

**10.** *Caudill* held that a co-conspirator's statement was inadmissible hearsay. 109 Idaho at 226, 706 P.2d at 460. Moreover, the only authority *Caudill* cites for the proposition that a promise of production is sufficient is a Court of Appeals case, *State v. Brooks,* 103 Idaho 892, 655 P.2d 99 (Ct.App.1983), which in this Court is not binding case law precedent.

**11.** Idaho Rule of Evidence 104(b) only allows evidence to be admitted conditionally when the issue is relevance. I.R.E. 104(b) ("Whenever the *relevancy of evidence* depends upon the fulfillment of a condition of fact, the court shall admit it upon, or in the court's discretion subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition" (emphasis added).). *But the issue at stake in co-*

... the preferred procedure, in our view, is to require the prosecution to establish the foundational requirements for the admission of a co-conspirator's statement *prior* to any offer of the statement into evidence before the jury....

*Montoya* at 733–4 (emphasis supplied).

Similarly, in *State v. St. Pierre,* 111 Wash.2d 105, 759 P.2d 383 (1988), the Washington Supreme Court held:

Prior to admitting co-conspirator statements, the trial court must first determine whether the state has shown, with substantial independent evidence, a prima facie case of conspiracy.... The trial court must also find that the statements were made during the course and in the furtherance of the conspiracy....

*St. Pierre* at 391 citing *State v. Dictado,* 102 Wash.2d 277, 687 P.2d 172 (1984) and *State v. Goodwin,* 186 P.2d 935 (1947).

To the same effect, *see,* [*e.g.,*] ... *Henderson v. State,* 372 So.2d 217 (Fla. Dist.Ct.App.1979)....

A pre-trial hearing is the best available mechanism for avoiding the unnecessary waste, expense, and delay of mistrial should the court determine in the midst of a trial that a conspiracy has not been proved. The pre-trial *James* hearing sought by the Appellant needs not be lengthy [nor] time consuming in nature. *Weinstein* observes that in most cases the judge can determine from colloquy, documents marked in advance of trial suppression hearings, and one or two witnesses whether there is sufficient evidence to warrant admission of a co-conspirator's statement. Armed with this information, the judge should rule conditionally on admissibility as soon as possible. *Weinstein's Evidence* at 104–56.

Appellant's Brief, pp. 40–44 (emphasis and footnote added). Unfortunately, the majority ignores this extremely persuasive argument as though appellant had never advanced it.

I am able to concur in the majority opinion result in this section only because Jones ultimately was not prejudiced by the trial court's refusal to hold a *James* hearing, as sufficient evidence of a conspiracy was introduced before the conclusion of the trial. For the future, however, the above well-worded excerpt from appellant's brief is commended to the trial courts so that they may avoid the dual specters of unfairness to defendants and judicial inefficiency in the context of co-conspirator statements.

## IV. WYSTRACH'S TESTIMONY AS TO THE "MEANINGFUL GLANCE" WAS A PRIVILEGED MARITAL COMMUNICATION AND SHOULD NOT HAVE BEEN ADMITTED.

I fully concur with the majority opinion's analysis of Jones's surveillance of the Vance property—such an act clearly was not communicative. But the majority fundamentally misapplies the concept of "confidential" and thereby missteps in its analysis of the "meaningful glance." The mere fact that the glance occurred in front of Wystrach's parents hardly proves that the glance was not confidential.[12] The pivotal question determining whether a communication is confidential when third parties are present should be whether those third parties perceived (i.e., heard, or, in this case, saw) the communication. At the very least, it should be demonstrated that the "speaker" did not intend the communication to be confidential, even though the third parties present did not perceive the communication.[13]

conspirator statements is not relevance; rather, it is whether the statement is inadmissible hearsay.

**12.** One is brought to wonder at the evolution of a "meaningful glance" into admissible evidence, especially in the setting of a capital case. The supposed "meaningful glance" proposition requires an undue strain on credulity. For certain it is not the equivalent of a spoken word, for which reason alone, as a mode of communication between two persons, there need be the

element of telepathy which, according to Webster is "communication through means *other* than the senses, as by the exercise of mystical powers." Webster's II, New Riverside Dictionary, 1190 (1988).

**13.** It might be contended that the lack of a basis of knowledge as to the fact that a communication is indeed communicative goes to show that the communication was intended to be confidential. In this instance, even accepting Wystrach's interpretation of the "glance," Jones knew Wystrach's

The State, as proponent of the challenged evidence, needed to prove that the communication was not intended to be confidential and therefore not privileged. This the State utterly failed to do. As to the physical set-up, Wystrach testified only that "Mom and [D]ad had two recliners and they sat on the recliners and Bob and I sat down on the ground in front of the couch with our feet out and we all watched the news.... The only thing that really bothered me was sitting in front of my parents." This testimony does not constitute an adequate foundation by which the trial court (or this Court) could determine that the glance between two individuals was not confidentially exchanged.

If Jones had whispered something to Wystrach while her parents were across the room, it would be ridiculous to contend that such a communication was not confidential nor was it intended to be confidential. *Cf. State v. Hoisington*, 104 Idaho 153, 160, 657 P.2d 17, 24 (1983) (conversation between defendant and client overheard by court reporter held to be admissible and that the alternative to speaking aloud in the courtroom, "client and counsel [having] to converse in whispers," is adequate to safeguard defendant's constitutional rights). Similarly, if Wystrach's parents were not in a position to observe the glance, it would still be confidential.

## V. THE EVIDENCE OF UNCHARGED CRIMES WAS IMPROPERLY ADMITTED AND WAS REVERSIBLE ERROR.

### A. Drug offenses

The majority opinion contends that the various testimony regarding the sale, possession, use, and delivery of controlled substance is admissible under I.R.E. 404(b). Yet it arrives at this conclusion without expounding upon any legal or factual analysis. This is not a surprise, for such an analysis would reveal that the challenged testimony is

patently inadmissible, violating both I.R.E. 404 and 403.

For instance, the testimony as to drug offenses of which Jones complains embraces Wystrach's testimony that Jones sold drugs roughly thirteen years before the trial date. How this testimony could demonstrate Jones's motive, intent, or plan to murder Vance approximately seven years later is utterly inconceivable. Similarly, Wystrach's testimony of Jones's and Martinez's drug dealing prior to when Cordell approached them cannot have any bearing on the Vance murder. Moreover, Jones never disputed lack of motive [14] or intent. As for the plan exception, testimony as to drug possession and sale after the murder might satisfy I.R.E. 404(b)'s "plan" exception to the general prohibition against character evidence. But the trial court allowed Wystrach to testify to a multitude of instances beyond such evidence, holding that "I think that [the testimony as to drugs] does fall within the exception to show the general scheme or plan, the life-style, as long as you don't get specific." Tr., p. 509. This instance is certainly a first in advancing the "lifestyle" exception to I.R.E. 404. The court went much too far in determining that the evidence fell within a "general scheme or plan." In fact, the only scheme or plan apparent from such testimony would be Jones's general scheme or plan to break the law—in other words, propensity evidence, the very evidence I.R.E. 404 strictly prohibits.

But even if it were clear that all the testimony as to controlled substances satisfied I.R.E. 404(b)'s exceptions, the majority fails to apply I.R.E. 403, as did the trial court fail to apply it. Rule 404(b) hardly marks the end of the analysis. The probity of the drug testimony was minimal at best, as demonstrated above; the potential for undue prejudice, however, was great. The jury could have concluded that because Jones allegedly dealt in drugs and involved Wystrach in that trade at a young age, he deserved to be sent

---

parents did not have sufficient knowledge of underlying facts sufficient to understand the significance of the glance. Thus, because there is no evidence the Wystrach's parents either perceived or were even reasonably intended to perceive the glance, the glance was privileged.

14. Logic would seem to dictate that the $15,000 allegedly offered to Jones and Martinez to kill Vance would be motive enough.

to prison, even were he not guilty of the murder. Furthermore, the jury might have concluded that the type of person to engage in such conduct was perfectly capable of murder for hire, again, precisely the type of conclusion the Rules of Evidence seek to prevent the jury from arriving at.

The vast majority of the drug testimony, then, should not have been admitted, and its inclusion constituted reversible error.

### B. Unspecified Murder

To find that an admitted violation of the Rules of Evidence is harmless error should require a strong conviction that "there was no reasonable *possibility* that the evidence complained of *might* have contributed to the conviction." *State v. Pizzuto*, 119 Idaho 742, 762, 810 P.2d 680, 700 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1268, 117 L.Ed.2d 495 (1992), overruled on other grounds by *State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991) (emphasis added, citation omitted). Such a standard is about as high as they come. The fact that the jurors "had ample other opportunity to discern the credibility of Wystrach and weigh it against that of appellant" does not support the majority's conclusion that "beyond a reasonable doubt, the evidence of the prior unspecified murder did not influence the jury's verdict." The question properly posed is, can the majority confidently assert that because the jurors had other evidence of Wystrach's credibility, the unspecified murder had no effect on the jury's verdict? I do not think so. In addition thereto, it is far from clear that the jurors did indeed have many other opportunities to discern the credibility of Wystrach apart from Wystrach's own testimony.

Finally, I disagree with the majority's conclusion that "[t]he most that the complained of testimony could have contributed was to bolster the credibility of Wystrach." The majority opinion finds the testimony as to the murder to be error in light of the fact that "Wystrach's inference is vague as to the victim" and "lack[s] specificity." Thus, we may conclude that the jury could have believed that the murder was actually another murder, admission of which would thus violate I.R.E. 404.

In view of the questions surrounding the significance of the psychiatrist's testimony, a wiser course would be to conclude that this Court cannot declare, beyond a reasonable doubt, that such powerful evidence could not conceivably have impermissibly contributed to the jury's verdict.

### VI. ALL EVIDENCE NEED NOT BE CIRCUMSTANTIAL TO REQUIRE A HOLDER INSTRUCTION.

The Justices comprising a majority engage in a subtle yet significant non sequitur when, after correctly stating that "*Holder* requires a circumstantial instruction to be given when the evidence linking the defendant to the crime charged is entirely circumstantial," they hold that "the trial court properly refused to give a *Holder* instruction because the case is not based entirely on circumstantial evidence." In *Holder*, it so happened that *all* of the evidence was circumstantial. *State v. Holder*, 100 Idaho 129, 133, 594 P.2d 639, 643 (1979). The Court reads into *Holder* a binary opposition where none exists. The third alternative is that a *Holder* instruction is required even when the evidence is *not* entirely but mostly circumstantial. As the author of the *Holder* opinion, this justice believes that *Holder* in no way limited itself, nor has this Court limited it, to instances in which the evidence is *entirely* circumstantial. Nor indeed is there any reason to so limit *Holder*. Even if *Holder* implicitly limited its holding to cases in which the evidence against a defendant is entirely circumstantial, it would be more logical to adopt the California test, as expressed in *People v. Wiley*, 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881 (1976):

> It is the duty of the trial court to instruct on general principles of law relevant to the issues raised by the facts of the case before it.... This obligation includes the duty to instruct on the effect to be given circumstantial evidence but only when circumstantial evidence is '*substantially relied upon* for proof of guilt.'

*Wiley*, 133 Cal.Rptr. at 142, 554 P.2d at 888 (citing *People v. Yrigoyen*, 45 Cal.2d 65, 286 P.2d 1 (1955) (emphasis added)). Since the jury requires help in understanding how to

interpret circumstantial evidence in light of the reasonable evidence standard, there is no reason to refrain from giving such an instruction when most, but not all, the evidence is circumstantial.

### CONCLUSION

Because of the aforementioned errors, as well as the error pointed out by the majority, this Court should reverse and remand the cause for a new trial.

JOHNSON, Justice, dissenting.

I respectfully dissent. I would reverse on the basis of the trial court's failure to dismiss the indictment (part I) and because of the admission at trial of uncharged crimes evidence (part VII).

As to part I, I conclude that Jones showed prejudice as required by the second prong of *Edmonson*.

I join Justice Bistline's dissent to part VII of the Court's opinion, as contained in part V of his dissenting and concurring opinion.